**Michael Angelo MORALES, Petitioner–Appellant,**

v.

**Jeanne S. WOODFORD, as Warden of San Quentin State Prison, Respondent–Appellee.**

**No. 99–99020.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 2001.

Filed July 28, 2003.

Amended Oct. 21, 2004.

David A. Senior, McBreen & Senior, Los Angeles, CA, for the appellant.

Keith H. Borjon, Supervising Deputy Attorney General, Los Angeles, CA, for the appellee.

Before: FERNANDEZ, KLEINFELD, and McKEOWN, Circuit Judges.

## ORDER

The opinion filed on July 28, 2003, is hereby amended. The clerk shall file the attached amended opinion and the attached dissent. The petition for rehearing and petition for rehearing en banc remains pending.

## OPINION

KLEINFELD, Circuit Judge:

Michael Morales, a state prisoner convicted of murder with special circumstances and sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus.

We previously issued this opinion at 336 F.3d 1136 (2003). This version is identical to that one except for this paragraph, and the section on the lying-in-wait special circumstance, which appears in Part B of the Analysis section, pages 31 to 45.

### Facts

A. The Murder and Investigation

Seventeen year-old Terri Winchell disappeared on a Thursday evening, January 8, 1981. Her mother lay sick in bed. Terri was getting ready to go out to pick up some food at a local restaurant. Before she left, she got a telephone call around 5:15 p.m. from Rick Ortega, a young man she knew through her friends. She spoke with him, then called her best friend Glenda Chavez. Terri told Glenda Chavez that Rick Ortega had asked her to go with him to the mall to pick out a present for his new girlfriend. Driving her mother's car, she left to pick up the food, telling her mother she "would be right back" and would be "back within the hour." Hours passed. Terri's mother became increasingly worried. She called the police to report that her car was missing around 10:00 that night, and reported that Terri was missing at 8:00 a.m. the next morning.

That day, Friday, the police interviewed Terri Winchell's mother, Terri's best friend Glenda Chavez, and Terri's friend Christine Salaices. They also interviewed Terri Winchell's boyfriend Randy Blythe.

The interviews led the police to Rick Ortega, whom they interviewed at a police station Friday night. Ortega gave the police permission to search his house and car, and they did, starting just before midnight Friday night. They found Ortega's shoes, which were wet, and noted that the tires and undercarriage of his car were also wet. The police found blood splattered all over Ortega's car, which smelled of ammonia. The officers returned to the station house around 1:00 a.m., Saturday morning. Around 2:00 a.m., Ortega led the police to a vineyard on the outskirts of town where they found Terri Winchell's body.

Terri was found naked except for a shirt and bra, which were pulled up over her breasts. She had suffered six blows to the side of her head and seventeen blows to the back of her head. The base of her skull had been shattered. Her skull, cheek bones, and jaw were fractured. She had been stabbed four times in the chest. Her face and body were severely bruised and much of the skin of her front side was torn up. She had multiple wounds on her hands and forearms, typical of a person defending herself.

Michael Morales was Ortega's cousin. He lived in Pat Flores's house. The police came there the next morning, Saturday, with a search warrant. They found a claw hammer, not in a toolbox or tool drawer, but in the vegetable crisper in the refrigerator. Blood was found on the hammer, but there was not enough to get a blood type. They found a kitchen knife with the tip broken off in a kitchen cabinet. In a bedroom, they lifted the mattress off the box spring and found hidden between

them a broken belt, which had blood on it consistent with Terri's. A wet towel smelling of ammonia was in a wastebasket. In another bedroom, they found a large kitchen knife on a night stand, and Terri Winchell's purse in the closet.

Morales was arrested and tried and convicted for rape and murder. So was Ortega, but his separate case is not before us.

## B. The Trial

The government tried Morales on three theories of first degree murder—murder with premeditation, murder by torture, and murder by lying-in-wait—and two special circumstances—intentional killing by torture and intentional killing by lying in wait. The prosecution theorized that Rick Ortega wanted to kill Terri Winchell out of jealousy, because Rick's male lover, Randy Blythe, was also Terri Winchell's boyfriend. Also, Terri had embarrassed Ortega by calling him a homosexual to her friends. Ortega recruited his cousin Michael Morales to help him kill her, and Morales agreed out of family loyalty.

Randy Blythe, Terri's boyfriend, testified at Morales's trial that he had indeed been in sexual relationships with both Rick Ortega and Terri Winchell. His relationship with Rick Ortega came first, though it was not entirely over when he became Terri Winchell's boyfriend.

Rick's former girlfriend Christine Salaices had been a friend of Terri Winchell. Christine testified that Rick Ortega had called her, crying, a few days after Terri and Randy Blythe started dating—ten months before the murder. Rick told Christine that he was crying because he had written Randy Blythe a letter proposing a sexual relationship, but that Randy then began seeing Terri. Christine then dumped Rick Ortega.

Randy Blythe testified that Terri Winchell did not know he was having sex with Rick Ortega, but Rick Ortega knew that he was having sex with Terri. After Randy Blythe began dating Terri, Rick told him that "I wish you wouldn't spend so much time with her." When Randy tried to end his relationship with Rick Ortega, Rick threatened to kill Randy and his family.

Christine Salaices, Rick Ortega's previous girlfriend, testified that five months before the murder, in August 1980, she met Ortega at a restaurant, where Ortega had told her that "he wanted to go to Randy's house and he wanted to ring the doorbell, and he was gonna wait for Randy to come to the door and to open the door. And he was gonna have a knife in his hand and he was gonna repeatedly stab Randy and turn the knife in him to see the expression on his face." Christine testified that Ortega had told her that "his cousin Mikey [Morales] would be with him because Mikey wouldn't let him stop. Mikey would help him and Mikey wouldn't let him stop, that Mikey would be there." According to Christine, Ortega said that "if Terri was there, she was gonna get it, too." Around the same time, Ortega repeatedly asked Christine to help him kill Randy Blythe. Christine testified that she had told Terri Winchell about Rick Ortega's threats. But, Christine, testified, by October 1980, three months before the murder, Rick Ortega "was supposedly feeling better about himself and trying to make amends with everyone that he had said these things to."

Mike Morales's girlfriend was Raquel Cardenas. Raquel testified that she had known Morales for seven months at the time of the murder. She testified that a few months before the murder, Morales told her that his "friend" had "gotten hurt by a girl, and . . . that he was feeling close to his best friend since he got hurt by that girl." Morales told her that this girl had

"dumped" his friend and because of this "he turned gay."

Glenda Chavez, Terri Winchell's best friend, testified that two weeks before the murder, she spoke with Rick Ortega on the telephone. Rick told her that Terri "was going around saying that he was gay" and that Terri "was gonna pay back for everything she was saying about him." But Rick Ortega called Glenda back a week later and told her "to tell Terri that everything was okay, that he wanted to be friends with her, and that he was gonna come over sometime and talk with her."

Pat Flores lived in the same house where Morales lived. She testified that the day before the murder, while she was sitting in her kitchen, "Mike [Morales] come up from behind me and he threw a belt around my neck and he tightened it up a little bit.... And then I ... took it off and I asked him what he was doing. He said he was practicing. I asked him, I said, 'Well, who are you going to do this to?' He goes, 'Never mind.' And I go, 'Do I know him?' He goes, 'No. Neither do I.' "

Around 11:00 in the morning on the day of the murder, Morales's girlfriend Raquel Cardenas went to Morales's house, where he lived with Flores. Raquel testified that Morales got a phone call at 4:30 p.m. According to Raquel, Morales told her that it was Ortega, and that "Rick was gonna come over later" and "pick up a girl." Raquel testified that Morales said "he was gonna do Rick a favor," that "he was gonna hurt this girl," that "he was gonna strangle her," that "he was gonna use his belt" and "put it around her neck."

Glenda Chavez also testified that Terri called her the afternoon before she was murdered. Terri told Glenda that Rick Ortega had called and asked Terri to come to the mall to help him pick out a present for his new girlfriend.

Raquel Cardenas, Morales's girlfriend, testified that Flores came home to where Morales lived around 5:30 p.m. the afternoon of the murder, and that Rick Ortega showed up around 6:00 p.m. Rick stayed around ten minutes, then left with Flores to go to the store, and came back fifteen minutes later with some wine. Morales drank the whole bottle of wine. Raquel testified that Morales and Ortega left around 6:30 p.m. and someone said that "Rick was supposed to take a girl to the mall." She testified on cross-examination that she didn't see Morales leave with a knife or hammer and didn't see whether he was wearing a belt.

Pat Flores likewise testified that, on the day of the murder, Ortega came to her house around 6:30 p.m. and went out with her to the store, about five minutes away, and came back with wine. Flores testified that after Mike Morales and Rick Ortega left, she noticed her hammer was missing when she looked for it to hang a picture. She also noticed that one of her set of two similar kitchen knives was missing. Flores identified this knife on the witness stand at Morales's trial.

Raquel Cardenas testified that Morales and Ortega came back about an hour later. Morales put a purse on the table, and "dumped everything out of the purse and started searching it." He showed her Terri's high school identification card. Raquel testified that Morales "threw a belt at [her]" and "told [her] the belt broke."

Pat Flores likewise testified that when Morales came back, he had a broken belt with him. Flores also testified that she saw Morales come in and start water running in the kitchen sink, then go back outside. She noticed spots on Ortega's collar and sleeve, spots that Raquel thought appeared like blood, and testified that Ortega asked her how to get them out. Morales told Flores to look at Orte-

ga's car, and she saw blood on the inside of the door, as did Raquel. Morales's hands "looked like he had blood on 'em.'"

Pat Flores testified that after Morales had driven Raquel home, he told Flores that "he had put a belt around someone's neck and then that it broke and then he—he hit her with the hammer and then—then they took her into a—field—and he drug her out of the car and then he—he—. . . He said that he stabbed her and then he said that he 'fucked her.'" When Flores asked Morales why, he said, "Whatever my family wants me to do, I'll do it."

Raquel Cardenas also testified that Morales "told me how he killed her." He said Rick was driving, Terri was in the front passenger seat, and he was sitting behind her. He "tried to strangle her . . . with the belt and it broke so he hit her over the head . . . with a hammer" and "he just kept hitting her, then he dragged her out of the car" and "left her in the vineyard." Morales told Raquel "it took awhile," that Terri "was a tough girl," and that "she was screaming for Rick . . . to make him stop."

Randy Blythe (Terri Winchell's boyfriend, and also Rick Ortega's boyfriend) testified that around 8:30 that night, he got together with Rick Ortega in Ortega's car. Rick performed a sex act on Randy. Randy testified that the car "smelled like ammonia."

The prosecution also presented testimony from a jailhouse informant, Bruce Samuelson. Like Pat Flores and Raquel Cardenas, Samuelson testified that Morales had told him he had killed Terri Winchell. Samuelson testified that, Morales told him that Morales and Rick Ortega arranged how to murder Terri Winchell, and that Rick had called him after he had picked Terri up. Morales told Samuelson that he had prepared for the murder by taking a belt, a knife, and a hammer. Morales, according to what he had told Samuelson, attempted to strangle Terri, the belt broke, he beat her head with a hammer, dragged her out of the car, raped her, and stabbed her to death.

When the police searched the house where Pat Flores and Mike Morales lived, they found Terri Winchell's purse. Christine Salaices, Rick Ortega's former girlfriend, identified the purse as belonging to Terri, as did Terri's best friend Glenda Chavez. The police also found blood in the floormats and all over the inside of Rick Ortega's car, and the broken belt under the mattress, which had blood on it consistent with Terri Winchell's blood type.

Raquel Cardenas testified that a year and a half after the murder, not long before the trial, Morales called her and told her to "get out of town some way so that [she would not] be handed a subpoena." Referring to her prior statement to the police, Morales told her that "he forgave [her] the first time but wouldn't forgive me the second time."

The jury convicted Morales of first degree murder with premeditation, found both special circumstances—intentional killing by torture and intentional killing by lying in wait—and returned a verdict for the death penalty.

## C. Post-conviction Proceedings

The California Supreme Court affirmed Morales's conviction, and the United States Supreme Court denied certiorari.[1] Morales's conviction became final November 27, 1989. He subsequently petitioned the United States District Court for a writ of habeas corpus on July 20, 1992, and after 20 of his 52 claims were dismissed without prejudice as not exhausted, he went back to the state courts on a state

---

1. *People v. Morales*, 48 Cal.3d 527, 257 Cal. Rptr. 64, 770 P.2d 244 (1989), *cert. denied,* *Morales v. California*, 493 U.S. 984, 110 S.Ct. 520, 107 L.Ed.2d 520 (1989).

habeas petition to exhaust them. The California Supreme Court denied his petition "on the merits and as untimely" on July 28, 1993.

Morales then amended his petition in the United States District Court. The district court considered the claims that the California Supreme Court had dismissed "on the merits and as untimely" as having been procedurally defaulted, but we reversed.[2] Our 1996 decision held that the California timeliness standards were too vague as applied to Morales's petition to furnish an adequate and independent state ground.[3] We therefore remanded for consideration of Morales's federal petition on the merits.

Back in district court, Morales moved for an evidentiary hearing on 39 of his 52 claims. That motion was denied, and ultimately Morales's petition was denied on the merits. So now, more than two decades after Terri Winchell was murdered, and after Morales was convicted by a jury in California Superior Court, lost his appeal in the California Supreme Court, was denied certiorari by the United States Supreme Court, lost his habeas case in the California Supreme Court, and lost his habeas case on the merits after some initial procedural skirmishing in the federal district court, we reexamine his case.

## Analysis

■■■■ Morales's petition for writ of habeas corpus was filed before the effective date of the Antiterrorism and Effective Death Penalty Act[4] ("AEDPA") but his appeal was filed after that date. Under our en banc decision in *Mayfield v. Woodford,*[5] we therefore apply pre-AEDPA law to the merits of the petition and our standard of review,[6] but post-AEDPA law on the statutory requirement[7] for a certificate of appealability. A certificate of appealability, which may only be granted on an issue-by-issue basis,[8] may only issue if Morales makes a "substantial showing of the denial of a constitutional right."[9] Morales satisfies this standard by demonstrating "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[10] On the merits, treating this as a pre-AEDPA petition, "[w]e presume that the state court's findings of historical fact are correct and defer to those findings 'in the absence of convincing evidence to the contrary' or a demonstrated lack of 'fair support in the record.' We review mixed questions of law and fact ... de novo. Finally, we review pure questions of law de novo."[11]

■■■ The certificate of appealability from the district court did not specify which issues could be appealed. We may not review the merits of Morales's appeal, however, unless we first determine with regard to each claim that Morales has

2. *Morales v. Calderon,* 85 F.3d 1387, 1388 (9th Cir.1996).

3. *Id.* at 1390–91.

4. Pub.L. No. 104–132, April 24, 1996, 100 Stat. 1214.

5. 270 F.3d 915 (9th Cir.2001) (en banc).

6. *Id.* at 921 & n. 5 (citing *Slack v. McDaniel,* 529 U.S. 473, 481–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

7. *See* 28 U.S.C. § 2253 (2000).

8. *Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000).

9. 28 U.S.C. § 2253(c)(2).

10. *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) (citation omitted) (quotation omitted).

11. *Mayfield,* 270 F.3d at 922 (citations omitted) (quoting 28 U.S.C. § 2254(d) (1994)).

made "a substantial showing of the denial of a constitutional right" that would justify issuing a certificate of appealability.[12] As we must issue a certificate of appealability on an issue-by-issue basis,[13] we treat the brief as requesting a certificate of appealability on all the issues presented, and grant it for: (1) improper jury instruction on the torture special circumstance; (2) unconstitutionality of the lying in wait special circumstance; (3) knowing use of false testimony of Raquel Cardenas; (4) use of a jailhouse informant (Samuelson) to evade Morales's right to counsel; (5) Confrontation Clause violation for Rick Ortega's remarks to Christine Salaices some months before the murder. We deny a certificate of appealability as to the remaining contentions and the undeveloped arguments suggested in footnotes.[14]

## A. Torture Special Circumstance

The California statute governing death penalty procedures provides that, in the phase of the trial for determining whether the defendant is guilty of first degree murder, the trier of fact must "determine the truth of all special circumstances."[15] A finding of "one or more" special circum-stances in California causes the murder to enter a penalty phase where the trier of fact determines whether to sentence the defendant to death or to life imprisonment without the possibility of parole.[16]

One of the special circumstances, which the jury in the case at bar found to be true, is that "the murder was intentional and involved the infliction of torture."[17] Morales argues that under a previous decision of ours, *Wade v. Calderon*,[18] he is entitled to have his petition granted because the jury instruction on this special circumstance was incorrect.

Morales's jury received two instructions regarding torture, one directed at torture as an element making the murder first degree, and the other directed at the special circumstance. Morales asserts that the torture special circumstance instruction erroneously omitted the intent requirement. The first degree murder instruction told the jury that torture requires an "intent to cause cruel pain and suffering" but it also told them that this "instruction does not apply to the special circumstance allegation of murder by torture."[19] The special circumstance in-

---

**12.** 28 U.S.C. § 2253 (2000).

**13.** *Morris,* 229 F.3d at 779.

**14.** *See* 28 U.S.C. § 2253(c)(1). We also do not review Morales's challenges to various collateral rulings of the district court because he has not properly presented them in his brief. *See In re Lowenschuss,* 67 F.3d 1394, 1402 (9th Cir.1995) (deeming as waived inadequately raised issues); *International Olympic Committee v. San Francisco Arts & Athletics,* 781 F.2d 733, 739 (9th Cir.1986) (declining to review an issue raised in a footnote and taking "the briefs as submitted" and limiting review "to the issues set forth in the briefs as required by Fed. R.App. P. 28(a)(2).").

**15.** Cal.Penal Code § 190.1.

**16.** *Id.* at §§ 190(b), 190.2(a).

**17.** *Id.* at § 190.2(a)(18).

**18.** 29 F.3d 1312 (9th Cir.1994).

**19.** The jury was instructed as follows on first degree torture murder:

> Murder which is perpetrated by torture is murder of the first degree. The essential elements of such murder are one, that the act or acts which caused the death must involve a high degree of probability of death; and two, *the defendant must commit such act or acts with intent to cause cruel pain and suffering* . . . .
> The crime of murder by torture *does not necessarily require any proof that the* . . . *deceased suffered pain.*
> *This instruction does not apply to the special circumstance allegation of murder by torture.* The elements required for that special circumstance allegation will appear later in these instructions.

(emphasis added).

struction, on the other hand, told the jury that to find the torture special circumstance to be true, they had to find that "the murder involved the infliction of torture." The instruction did not require an intent to cause severe pain.[20]

We held in *Wade v. Calderon* that this same California torture special circumstance instruction violated the Eighth Amendment,[21] adopting the reasoning of the California Supreme Court decision in *People v. Davenport.*[22] In *Wade*, we concluded that, without a jury determination that the defendant intended to torture, the distinction between murders where the victim did and did not feel extreme pain might "have nothing to do with the mental state or culpability of the defendant and would not seem to provide a principled basis for distinguishing capital murder from any other murder."[23] We accordingly directed the district court to issue the writ because we held, under the facts presented in *Wade*, that this error was not harmless.[24] We provided that no new sentence of death could be imposed without a new determination of special circumstances.

The case at bar is indistinguishable from *Wade*, as to the error regarding the instruction on the torture special circumstance. The next issue is whether, as in *Wade*, the writ must be granted unless a new sentence of death is imposed without the special circumstance.

The State argues that because *Wade* came down in 1994, after Morales's conviction was final, it was a "new rule," so it could not be applied to Morales's case.[25] We reject this argument because the rule was not new. When Morales's direct appeals were pending, the California Supreme Court had already held in *Davenport*, the case quoted and in this respect followed by *Wade*, that the special circumstance instruction for torture had to require a finding of intent, or else it would allow arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment. On Morales's direct appeal, the California Supreme Court held that the torture special circumstance instruction was error.

Following the California Supreme Court decision affirming Morales's conviction,[26] the State also argues that the instructional error was harmless. The California Supreme Court concluded, and the State urges us to agree, that the jury necessarily found the requisite intent pursuant to its instruction on torture as an element in first degree murder. That contention is incorrect. The instructions allowed the jury to treat the murder as first degree on various grounds without finding an intent to torture, such as if it found

---

**20.** The jury was instructed as follows on the torture special circumstance:

> To find that the special circumstance ... [of] murder involving infliction of torture is true, each of the following facts must be proved. One, that the murder was intentional; and two, that the murder involved the infliction of torture.
> To prove the infliction of torture, *the infliction of extreme physical pain must be proved* no matter how long its duration.
> Awareness of pain by the deceased is not a necessary element of torture.
> (emphasis added).

**21.** *Wade*, 29 F.3d at 1320.

**22.** 41 Cal.3d 247, 221 Cal.Rptr. 794, 710 P.2d 861 (1985).

**23.** *See Wade*, 29 F.3d at 1320 (citing *Davenport*, 221 Cal.Rptr. at 804, 710 P.2d 861).

**24.** *Id.* at 1322, 221 Cal.Rptr. 794, 710 P.2d 861.

**25.** *See Teague v. Lane*, 489 U.S. 288, 306–08, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**26.** *See People v. Morales*, 48 Cal.3d 527, 257 Cal.Rptr. 64, 770 P.2d 244 (Cal.1989).

premeditation and deliberation. The verdict does not establish that the jury found the element of torture as a basis for its first degree murder verdict.

■■■■ The State also argues that the closing arguments by counsel sufficiently educated the jury that intent was essential. We must presume, however, that the jury took the court's instructions as its authority on the law, and the instructions told the jury that intent is an element of torture as a basis for first degree murder but is not an element of the torture special circumstance. The instructions also informed the jury that the first degree murder torture element and the special circumstance of torture are different and one did not speak to the other. Thus, we cannot assume that the jury's finding of intent with respect to the first degree murder instruction necessarily means that the jury would have found intent with respect to special circumstances. Although the jury made a finding that Terri Winchell "was aware of extreme physical pain inflicted by said defendant," the jury did not make a finding that Morales intended to inflict it.

■■■■ In Morales's direct appeal, the California Supreme Court reasoned that the jury necessarily found as a matter of logic an intention to inflict severe pain on Terri Winchell, because otherwise "there would have been no purpose in its special finding regarding the victim's awareness of the extreme physical pain." [27] We do not agree that the awareness of pain finding implies a jury determination on intent. There may have been no purpose in *instructing* the jury to make a finding about

the victim's awareness of pain, without an instruction requiring intent, but the *jury's* purpose may have been merely to follow the instructions and fill in the answers to the questions provided to it.

The State also argues that the error was harmless because the jury also found true the lying in wait special circumstance. Morales argues that the lying in wait instruction was also unconstitutional, but as we explain below, we conclude that it was constitutionally permissible.

The analysis of the instructional error depends, under controlling law, on whether California is a weighing or a non-weighing state.[28] We have previously said in dictum that California is a weighing state under the current version of its death penalty statute.[29] If all the special circumstance of torture did was to move the case to a penalty phase, and the special circumstance was not weighed as such (though the evidence could be considered) at the penalty phase, then validity of the lying in wait special circumstance would make invalidity of the torture special circumstance harmless.[30] In a weighing state, on the other hand, we may not "assume it would have made no difference if the thumb had been removed from death's side of the scale." [31] Rather, "[w]hen the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." [32]

We need not decide whether California is a weighing state to decide this case. Assuming *arguendo* that it is, harmless

**27.** *Id.* at 83–84.

**28.** *Stringer v. Black,* 503 U.S. 222, 229–30, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Williams v. Calderon,* 52 F.3d 1465, 1477 (9th Cir.1995); *Jeffers v. Lewis,* 38 F.3d 411, 414–15 (9th Cir.1994) (en banc).

**29.** *Silva v. Woodford,* 279 F.3d 825, 829 & n. 1 (9th Cir.2002).

**30.** *See Williams,* 52 F.3d at 1479.

**31.** *See Stringer,* 503 U.S. at 232, 112 S.Ct. 1130.

**32.** *Id.*

error analysis leads us to conclude that Morales is not entitled to relief.

We note first that, although the jury weighed an invalid special circumstance, the California Supreme Court could have cured the error and affirmed Morales's sentence in several ways.[33] First, the California Supreme Court could have found the error harmless under *Chapman v. California.*[34] Under *Chapman,* the state appellate court can affirm if it finds beyond a reasonable doubt that the same result would have been obtained without relying on the unconstitutional aggravating circumstance.[35] The California Supreme Court also could have cured the instructional error by "reweighing" aggravating and mitigating circumstances under *Clemons v. Mississippi.*[36]

Here, however the California Supreme Court simply asserted that the instructional error was harmless and did not engage in the analysis of the record necessary to conclude that the same result would have been obtained without relying on the torture special circumstance. Nor did the California Supreme Court perform any reweighing of the factors the jury considered, excluding the torture special circumstance, because it concluded (mistakenly in our view) that the finding that the victim suffered severe pain logically implied that

it had found intended torture. Under our en banc decision in *Valerio v. Crawford,* this was insufficient.[37]

We therefore have neither state appellate court reweighing nor harmless error analysis to which deference might be appropriate.[38] In the absence of the requisite "close appellate scrutiny" by the state courts reviewing Morales's sentence, we must conduct our own independent harmless error analysis.[39]

Ninth Circuit precedent requires us in this circumstance to apply *Brecht* harmless error review to the mistaken torture special circumstance instruction.[40] The torture special circumstance, for which the instruction was unconstitutionally erroneous, was among the factors the jury was to weigh, though it was no more than that. As we have already held this was error, the state must provide us with a "fair assurance" that the error was harmless under *Brecht.*[41]

■ *Brecht v. Abrahamson* holds that where there is constitutional error but the review is collateral rather than direct, we should not apply the "harmless beyond a reasonable doubt" *Chapman*[42] standard, and should instead apply the "less onerous" *Kotteakos* standard.[43] Accordingly, the critical question is "whether, in light of the record as a whole," the error "had

---

**33.** *See Valerio v. Crawford,* 306 F.3d 742, 756–57 (9th Cir.2002) (en banc).

**34.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**35.** *Valerio,* 306 F.3d at 756.

**36.** 494 U.S. 738, 748, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

**37.** *Valerio,* 306 F.3d at 756–60.

**38.** *Id.* at 757.

**39.** *Id.* at 761.

**40.** *See id.* at 762. *See also Wade,* 29 F.3d at 1322. Because Morales is a state prisoner

seeking a writ of habeas corpus, we must apply *Brecht* harmless error analysis. *See Bains v. Cambra,* 204 F.3d 964, 976–77 (9th Cir.2000). That Morales's sentence is for death does not change this analysis. *See Valerio,* 306 F.3d at 762.

**41.** *Valerio,* 306 F.3d at 762 (citing *Gray v. Klauser,* 282 F.3d 633, 651 (9th Cir.2002)).

**42.** *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**43.** *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (referencing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

substantial and injurious effect or influence in determining the jury's verdict." [44] On collateral review, *Brecht* holds that a federal court cannot grant the writ based merely on a "reasonable possibility" that the constitutional error contributed to the verdict, but only where the petitioner "can establish that it resulted in actual prejudice." [45]

There are some cases where an instructional error like the one Morales suffered would be, as a matter of law, not harmless under *Brecht.* For instance, in *Wade,* the error was not harmless as a matter of law because our invalidation of the special circumstance eliminated the only remaining special circumstance.[46] Thus, our holding in *Wade* meant that the prisoner was no longer death penalty eligible under California law, so that the error was manifestly not harmless. But, in the case at bar, Morales, unlike Wade, remains death penalty eligible due to the validity of the lying in wait special circumstance. Thus, we must determine based on a close review of the record as a whole "whether the actual instruction had a substantial and injurious effect or influence on the jury's verdict." [47]

■■■ Applying the *Brecht* standard, we conclude, after thorough study of the record "as a whole," that the instructional error regarding the torture special circumstance did not have a "substantial and injurious effect or influence in determining the jury's verdict." The state's testimonial and physical evidence implicating Morales was overwhelming. There was no conflicting evidence regarding whether Morales murdered Terri Winchell, why he murdered her, or how he murdered her. And

it was an entirely gratuitous and terribly vicious murder.

As in *Williams v. Calderon,* consideration of the torture special circumstance as such "adds only an improper label." [48] Because Terri Winchell took so long to die, not only was the abuse extreme, but Morales had a long time to repent, had he been morally so disposed, even during his acts of strangling, hammering and stabbing her. There is no reason to doubt on this record that the jury decided that Morales murdered her because he was Rick Ortega's cousin and Rick was angry at and jealous of her. There is no reason to doubt that the jury decided Morales helped trick her into the car, sat behind her planning to kill her after some practice with a belt and having brought a belt, hammer, and knife to do it with. There is no reason to doubt that after he failed to kill her by strangling her with the belt, he beat her head in with a hammer, and when she still lived, dragged her out of the car, raped her, and stabbed her several times. Because we cannot, on this record, doubt that the jury so found, it would be unwarranted for us to think that it mattered to the jury whether Morales's conduct was labeled "torture special circumstance" by the California statute. To grant the writ under these circumstances would be to act on, at most, a "reasonable possibility" that the special circumstance label mattered to the verdict, and *Brecht* prohibits us from doing that.

The evidence was so overwhelming that the constitutional error cannot be said to have had an effect upon the verdict in the case at hand.[49] The jury could have decid-

---

**44.** *Id.*

**45.** *Id.* at 637, 113 S.Ct. 1710.

**46.** As our opinion in *Wade* notes the other special circumstance Wade's jury found to be true was invalidated by the California Supreme Court. *See Wade,* 29 F.3d at 1322–23.

**47.** *Valerio,* 306 F.3d at 762.

**48.** *Williams,* 52 F.3d at 1477.

**49.** *Id.*

ed that Morales initially intended to kill Terri Winchell quickly without much pain by strangling her. But the jury knew two things that would prevent them from ending their inquiry there. One was that he brought a hammer, which meant that he did not know if strangling would work, and intended to beat her head in if it did not. The second, unavoidable conclusion was that he kept going after strangling failed. Once she survived the strangling, the jury would have had to decide that he intended his subsequent conduct even though he saw as he performed it that she was surviving and suffering.

Given the factual record here, it is mere speculation that the absence of the torture special circumstance would have mattered to the jury. Mere speculation is insufficient to grant the writ under *Brecht*, because speculation does not give rise to a "grave doubt" whether the error had a substantial effect in determining the jury's verdict.[50] A harmless error analysis that would vacate the death sentence absent the jury "necessarily" finding the torture murder special circumstance is "far too strict" under *Brecht*.[51]

### B. Lying–In–Wait Special Circumstance

The jury also found the special circumstance of lying in wait to be true. The instructions defined "lying in wait" as requiring "waiting, watching, and concealment," followed by immediate, surprise attack. The instructions further defined "concealment" as "ambush" or, alternatively, "creation of a situation where the victim is taken unawares even though he sees his murderer." The instructions given to the jury qualified this definition by explaining, "it is only concealment which puts the defendant in a position of advantage from which it can be inferred that lying in wait was part of the defendant's plan to take his victim by surprise." A "perceptible interruption" between the "concealment and watchful waiting" and the period during which the killing took place would defeat the special circumstance.

Under the California statutes at the time of Morales's trial, murder committed "by means of" lying in wait was, by virtue of that aggravating factor, first-degree murder.[52] Murder that is first-degree, whether for that reason or another, and that was committed in the "special circumstance" that the killing is "while" lying in wait, subjects the defendant to a sentence of life without possibility of parole, or death.[53] The "by means of" factor enhances the murder to first-degree murder, and the "while" factor allows the first-degree murderer to be death-penalty eligible. Then the jury weighs the "while" factor, along with many others, to determine whether to impose the death penalty.[54]

Morales's argument makes no reference to the actual instructions the jury was given or the evidence the jury heard in this case. Nor does Morales claim that the actual jury instructions failed to distinguish meaningfully between lying in wait and mere premeditation and deliberation. Without some connection between the claimed constitutional problems with the lying-in-wait circumstance and what actually occurred in Morales's trial, we cannot

---

**50.** *See Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir.2000) (citing *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

**51.** *See California v. Roy*, 519 U.S. 2, 4, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam).

**52.** Cal.Penal Code § 189.

**53.** *See id.* §§ 190.1, 190.2(a)(15).

**54.** *See id.* § 190.3.

say that the Eighth Amendment was violated in this case by the manner in which the special circumstance was applied. Morales instead makes a facial challenge.

■ As for the constitutionality of the special circumstance on its face, a circumstance that makes one eligible for the death penalty must meet two requirements to satisfy the Eighth Amendment: "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a sub-class of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague."[55] Morales appears to be arguing that neither of these requirements is satisfied by the lying-in-wait special circumstance. The dissent accepts Morales's first argument, taking the position that the special circumstance applies to virtually every murderer.

We have revised this section of the opinion to respond to the dissent and to appellant's clarification of his argument in his petition for rehearing. Though our opinion as previously published was unanimous, we have all carefully considered the petition for rehearing, and our dissenting colleague has changed her mind on this point. The dissent now takes the position that "the confluence of lying-in-wait and other types of murder is virtually complete."[56]

■ Under *Godfrey v. Georgia*, for death-penalty eligibility standards to satisfy the Eighth Amendment's non-vagueness requirement, such eligibility criteria must provide "a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not."[57] This requires the state to provide "clear and objective standards" that "channel the sentencer's discretion," obviating "standardless sentencing discretion."[58] If the standards are "so vague that they would fail" to channel discretion, then they allow "arbitrary and capricious sentencing" in violation of the Eighth Amendment.[59] The Court in *Tuilaepa v. California* rejected a broad challenge to the California scheme before us now.[60] In so doing the Court held that the *Godfrey* requirements are "not susceptible of mathematical precision" so "vagueness review is quite deferential."[61]

■ We held in *Houston v. Roe* that the California "lying in wait" special circumstance is not unconstitutionally vague as an eligibility factor.[62] Our holding in *Houston* was premised on the conclusion that California had "created a thin but meaningfully distinguishable line between first degree murder lying in wait and special circumstances lying in wait."[63] While *Houston* was a Fifth–Amendment due-process case rather than an Eighth–Amendment case, it asked and answered the question whether the lying-in-wait circumstance was too vague. *Houston* thus makes clear that the lying-in-wait circumstance satisfies at least one of the two requirements—avoidance of vagueness—

---

**55.** *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (internal citations omitted).

**56.** Dissenting Op., at 1180.

**57.** *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (internal quotation marks and editing omitted).

**58.** *Id.* at 428, 100 S.Ct. 1759 (internal quotation marks and editing omitted).

**59.** *Id.* (internal quotation marks omitted).

**60.** *Tuilaepa*, 512 U.S. at 972–73, 114 S.Ct. 2630.

**61.** *Id.* at 973, 114 S.Ct. 2630 (internal quotation marks omitted).

**62.** *Houston v. Roe*, 177 F.3d 901, 907–08 (9th Cir.1999).

**63.** *Id.* at 907.

that the Supreme Court has imposed on eligibility determinations.

As the Supreme Court made clear in *Tuilaepa*,[64] however, vagueness is not the only inquiry. We must also ensure that the California regime adequately narrows the class of murderers subject to the death penalty. The remainder of this section addresses that issue, without reliance upon *Houston* and other Fifth Amendment analysis. The dissent appears to imply that our Eighth Amendment analysis is based on "reliance on *Houston* [ ]" for "the lying-in-wait special circumstance."[65] Here in the paragraphs below is the separate analysis of the Eighth Amendment issue. We follow *Houston* for vagueness, as stare decisis requires, but not for the Eighth Amendment narrowing issue.

The lying-in-wait circumstance is not overly broad such that it "appl[ies] to every defendant convicted of a murder." Such over breadth would render it inadequate under *Tuilaepa*.[66] Evidently, California regards ambush as an especially immoral way of murdering someone. The lying-in-wait special circumstance codifies that moral sentiment. Our dissenting colleague is quite right that the California Supreme Court has interpreted it liberally, to embrace not just traditional ambush, but murder accomplished by surprising the victim. Where we differ is that the dissent thinks almost all first-degree murders satisfy the California lying-in-wait requirements as so interpreted, and we do not. The three elements of lying in wait, in California law, are "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim

from a position of advantage."[67] The combination of these elements embraces some first-degree murders, but not all.

To illustrate a non-lying-in-wait murder: a sadistic person who wants the victim to know what is coming, and who has no doubt of his ability to accomplish the crime, may confront the victim face to face, say "I'm going to kill you," and do so. Or a person intending to kill another may threaten the victim, travel armed, and when he spots his intended victim by chance, approach him and shoot him face to face. Or, not uncommonly, the loser of a bar fight may say "I'm going to kill you," go to his car or his home and get a gun, come back to the bar, confront the victim saying "now I'm going to kill you," and do so. Even under the California Supreme Court's liberal interpretations of lying in wait, these hypothetical first-degree murders would not merit the special circumstance. The dissent says that "like a Venn diagram of nearly overlapping circles, the confluence of lying-in-wait and other types of murder is virtually complete."[68] The weasel words here are "nearly" and "virtually." Without them, these common murder scenarios falsify the dissent's proposition. With the words "nearly" and "virtually," it is hard to attribute any meaning to the dissent's proposition, because it apparently cannot be falsified by any empirical demonstration. These common murder scenarios would be cases within what the dissent claims is the empty ("nearly" empty? "virtually" empty?) set of first-degree murders not involving lying in wait.

Four California Supreme Court decisions similarly illustrate facts placing the cases in the set that our dissenting col-

---

64. *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

65. Dissenting Op., at 1181.

66. *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630.

67. *Morales,* 257 Cal.Rptr. 64, 770 P.2d at 261.

68. Dissenting Op., at 1180.

league thinks is the empty set of first-degree murders that do not involve lying in wait. In *In re Andrews,* a robber killed three victims, one for trying to escape, another apparently for not telling him where the drugs and money he wanted were, and a third apparently for walking in on the crime.[69] There was no lying in wait. In *People v. Anderson,* the defendant and another murdered a woman because they thought she had molested the daughter of one of the murderers.[70] The victim had already been beaten, stripped naked, and tied up by the defendant and others. When the defendant and his accomplice spotted her after she got herself free and was escaping, they pulled her into their car and killed her.[71] No concealment of purpose, no watching and waiting, no surprise. In *People v. Reynoso,* two men argued heatedly, and then one shot the other dead, in the chest, with a shotgun at point-blank range.[72] No ambush there, no matter how liberally lying in wait may be construed. In *People v. Batts,* two gang members, including the defendant, told a younger member to leave the place where the younger member was washing his car, or else something would happen.[73] The younger man refused to leave and, along with his brother, argued with the older gang members. So the defendant and his friend left, returned armed (the defendant had a gun in each hand, the other man made do with one gun), and shot the younger men, killing one of them.[74] No ambush there, just a head-on attack with three guns blazing.

To us, it seems unimaginative, or perhaps blind to these and the many cases like them, to suppose that "the confluence of lying-in-wait and other types of murder is virtually complete."[75] As we have explained above, to prove the special circumstance of lying in wait under California law, the government must prove first-degree murder plus the three elements of lying in wait: concealment of purpose, watching and waiting, and a surprise attack from a position of advantage.[76] We have described murders committed in ways that would not satisfy one, or even any, of these three requirements. Some murders are accomplished by ambush, some are not, and the special circumstance sorts out which is which.

The dissent's position is, in substance, that the California Supreme Court has not really meant what it said when it laid out the three requirements of lying in wait because it has interpreted them so broadly as to eliminate any discrimination between lying-in-wait murders and all other first-degree murders. The dissent says first-degree murders and lying-in-wait murders are "like a Venn diagram of nearly overlapping circles"[77]—that is, nearly congruent sets, with no cases in the first-degree murder set that are not in the lying-in-wait set. Factually, as the cases described above show, this contention is entirely without force.

The dissent's legal argument relies on mistaken use of quotations and citations pulled out of context from some California cases. As described above, lying in wait,

**69.** *In re Andrews,* 28 Cal.4th 1234, 124 Cal. Rptr.2d 473, 52 P.3d 656, 658 (2002).

**70.** *People v. Anderson,* 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368, 370 (2002).

**71.** *Id.*

**72.** *People v. Reynoso,* 31 Cal.4th 903, 3 Cal. Rptr.3d 769, 74 P.3d 852, 855 (2003).

**73.** *People v. Batts,* 30 Cal.4th 660, 134 Cal. Rptr.2d 67, 68 P.3d 357, 361 (2003).

**74.** *Id.* at 361–62.

**75.** Dissenting Op., at 1180.

**76.** *Morales,* 257 Cal.Rptr. 64, 770 P.2d at 261.

**77.** Dissenting Op. at 1180.

under California law, is a term used not only for a death-penalty special circumstance, which is the subject of this case; it is also a term used to describe a substitute for premeditation and deliberation when determining whether a murder is a first-degree murder. That is, entirely apart from how it may affect his penalty, if a person lies in wait to kill another, California treats him as having the equivalent of premeditation and deliberation.

While the meanings of the term "lying in wait" in these two contexts are obviously related, they have been interpreted to mean different things. The California Supreme Court has expressly stated that lying in wait as a special circumstance for the death penalty contains "more stringent requirements" than lying in wait as an indicator of first-degree murder.[78] Among the distinctions is that lying in wait as a special circumstance, unlike lying in wait as a first-degree factor, requires all three elements mentioned above—concealment of purpose, watching and waiting, and surprise—and lying in wait as a special circumstance requires that the murder be committed *while* lying in wait.[79] That is, the special circumstance has the requirement that there be no gap in time between the murder and the period of watching and waiting. This is not required for lying in wait as a substitute for premeditation and deliberation. Thus, lying in wait as a special circumstance is more difficult to satisfy than is lying in wait as an aggravator that makes a killing first degree murder.

Despite the differences in the term's meaning, the dissent quotes from and relies on several cases about the premeditation and deliberation substitute to make its point about the death-penalty special circumstance. The dissent's citations manifest confusion about the distinction between the two uses of lying in wait. Because the term is used for a different purpose in the cases the dissent cites, those cases are inapposite. What's more, even though the language in some of the dissent's chosen cases is liberal and permissive, the facts in each case show that the defendant in each did in fact engage in a genuine ambush.

For example, the dissent quotes from *People v. Ruiz* to argue that the California Supreme Court has interpreted lying in wait as " 'the functional equivalent of proof of premeditation, deliberation and intent to kill.' "[80] The court in *Ruiz*, however, was addressing lying in wait as a factor that turns murder into first-degree murder, not lying in wait as a special circumstance for death-penalty eligibility. Lying in wait is, of course, the "functional equivalent" of first-degree murder when the court is considering lying in wait as a substitute for premeditation and deliberation to raise murder to the first degree. But that does not mean that the death-penalty circumstance, particularly with its requirement that the murder be committed *while* the killer lies in wait, is the "functional equivalent" of first-degree murder. The special circumstance is not what the California Supreme Court was talking about in *Ruiz*. Furthermore, *Ruiz* involved a defendant who "watched and waited until his victims were sleeping and helpless before executing them," which supports a finding of lying in wait under any definition.[81] Thus, neither the "functional equivalent" state-

---

**78.** *People v. Hillhouse*, 27 Cal.4th 469, 117 Cal.Rptr.2d 45, 40 P.3d 754, 775 (2002) (internal quotation omitted).

**79.** *See People v. Gutierrez*, 28 Cal.4th 1083, 124 Cal.Rptr.2d 373, 52 P.3d 572, 612–13 (2002).

**80.** Dissenting Op., at 1185 (quoting *People v. Ruiz*, 44 Cal.3d 589, 244 Cal.Rptr. 200, 749 P.2d 854, 867 (1988)).

**81.** *See Ruiz*, 244 Cal.Rptr. 200, 749 P.2d at 867.

ment nor the facts of *Ruiz* support the dissent's argument.

Likewise, *People v. Tuthill,* upon which the dissent relies to argue that the watching-and-waiting element is meaningless, is also a case about lying in wait as a first-degree factor rather than as a death-penalty special circumstance.[82] And like *Ruiz,* the facts of that case do not support the suggestion that the term is promiscuously applied to all murders and, therefore, that lying in wait does not mean anything. In *Tuthill,* the defendant "entered the cabin surreptitiously, after [the victim's] repeated refusals to see him alone, took the gun from the wall, loaded it, and lay down on the bed concealing it."[83]

*People v. Hillhouse* is the only case whose facts the dissent discusses that really is about lying in wait as a death-penalty special circumstance. The dissent says that *Hillhouse* establishes that "even concealment of purpose is not always necessary," and that under California law "criminal defendants meet the concealment test regardless of whether they are hidden or seen, and even whether they conceal their intentions or reveal them."[84] Not so. The victim flashed a hundred-dollar bill in a bar, so when he was drunk, the murderer drove him to a remote location. While the victim was urinating next to the truck, the murderer said, "I ought to kill you," and stabbed him to death.[85] The court said that the jury could reasonably conclude that, planning to kill the victim, the murderer "waited and watched for the opportune moment to strike, which presented itself when [the victim] was urinating."[86] Though the dissent claims that the statement, "I ought to kill you," makes meaningless the requirement of concealment, the court concluded that the remark was "virtually simultaneous with the stabbing," and the murderer "took him by surprise."[87]

Not every ambush has to be from the bushes. Our dissenting colleague calls this remark "a simplistic syllogism,"[88] but it is neither a syllogism nor simplistic. California has broadened the meaning of lying in wait beyond B-movie stage-coach robberies. That does not mean the term has no narrowing meaning. That not every ambush has to be from the bushes, yet murders by ambush differ from murders without ambush, is, in short and plain form, the answer to the narrowing argument. Clarity is not the same thing as oversimplification. Obfuscation can be a shield for murderers.

C. Knowing Use of Perjury

■■■ Morales argues that he was denied due process of law by the government's knowing use of perjured testimony

---

**82.** Dissenting Op., at 1187 n. 2 (citing *People v. Tuthill,* 31 Cal.2d 92, 187 P.2d 16, 20 (1947)).

**83.** *Tuthill,* 187 P.2d at 21. The dissent also points to the fact that the defendant in *Tuthill* fell asleep while he waited, which the dissent says undermines any meaning that the "watchful and waiting" requirement would otherwise have. Dissenting Op., at 1187 n. 2. The dissent does not mention, however, that the court considered this point and concluded that "[d]efendant's presence in the cabin was unexpected, and obviously [the victim] was unaware of her danger, of the tenacity of the defendant's grim objective and of his purpose

to kill her." *Tuthill,* 187 P.2d at 21. That the defendant fell asleep waiting for the victim of his ambush to arrive did not vitiate the fact that he ambushed his victim.

**84.** Dissenting Op., at 1187.

**85.** *Hillhouse,* 117 Cal.Rptr.2d 45, 40 P.3d at 775.

**86.** *Id.*

**87.** *Id.*

**88.** Dissenting Op., at 1180.

by Raquel Cardenas to obtain his conviction. The government's knowing use of perjured testimony to obtain a conviction violates a defendant's right to due process of law.[89]

■ In 1994, over a decade after the trial, Raquel Cardenas signed an affidavit for Morales saying that she had lied in her trial testimony. Specifically, she stated that she lied when she testified that Morales told her that he had murdered Terri Winchell, that he told her how he committed the murder, and that she saw blood in the car. Though Raquel's recantation, if true, undermines some of her testimony it would not undermine all of it. Nor does her affidavit demonstrate that the prosecution knew that she was lying during her testimony at trial.[90]

The due process requirement voids a conviction where the false evidence is "known to be such by representatives of the State."[91] The essence of the due process violation is misconduct by the government, not merely perjury by a witness.[92] Morales, however, sets out no factual basis for attributing any misconduct, any knowing presentation of perjury, by the government. Thus there is no basis for granting the writ even if Raquel Cardenas did lie. That a witness says some years later that she lied at trial does not furnish a basis for granting the writ on account of the state's *knowing* use of perjury (though, of course, it may on other grounds not urged here,

such as when the new evidence demonstrates actual innocence).

■ No evidentiary hearing is necessary with respect to the purported perjury claim. An evidentiary hearing is unnecessary because Raquel's allegation that she perjured herself, even if proved, would not entitle the Morales to relief.[93] At most, Morales is able to show that Raquel perjured herself in part, but makes no colorable showing of knowing use of perjured testimony. Given the evidentiary submissions by Morales, the district court did not abuse its discretion in denying an evidentiary hearing on whether the government knowingly presented perjured testimony.

### D. The Jailhouse Informant

Morales argues that the government put another prisoner, Bruce Samuelson, in a cell diagonally opposite to his in segregation, and offered him leniency, in order to have Samuelson extract a confession from Morales. He argues that he is entitled to the writ under *Massiah v. United States*[94] and *United States v. Henry*[95] because this interfered with his right to counsel.

■ In support of his motion for an evidentiary hearing, Morales submitted as evidence an interview that an assistant attorney general and his investigator had with Samuelson in 1993, eleven years after the trial, as the attorney general's office prepared for one of the habeas proceed-

---

**89.** *United States v. LaPage*, 231 F.3d 488, 491 (9th Cir.2000).

**90.** In the recantation affidavit, Raquel Cardenas says that Morales returned to the apartment "all riled up" after about an hour, "threw a purse at me," and exclaimed that "the damn belt broke." Though Raquel says she felt pressured when she made her statement to the police and when she testified, Raquel says nothing whatsoever in her recantation affidavit to suggest that the police or the prosecution knew she was lying.

**91.** *Id.* (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).

**92.** *Id.* at 491–92.

**93.** *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir.1999).

**94.** 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**95.** 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

ings. But this evidence doesn't raise a colorable claim. Samuelson does not say that he was put into Morales's cell to extract admissions from Morales. To the contrary, Samuelson says that before or during the trial an "insinuation" was made to that effect, but it was "not the case at all." Samuelson states that the reason he was put in segregation was that he asked to be put there, so that he could avoid contact with the general prison population and have his own room where his things would be safe from theft. He got to talking with Morales because he was impressed with Morales's work as an artist.

 Morales argues that Samuelson is demonstrably lying about. this, because Samuelson says they spoke in Spanish, and Morales does not speak Spanish. But whether Samuelson is lying in his 1993 interview is not the question. Morales presents no evidence to demonstrate that the state planted Samuelson near him to get him to talk outside the presence of his attorney. On this record, the district court did not abuse its discretion in denying an evidentiary hearing on whether the state planted Samuelson.[96] That Samuelson bargained with what he had—information—for what he wanted—lenience—does not support an inference that he was planted to get such information.

### E. Confrontation Clause

Morales argues that his constitutional right to confront witnesses against him was violated when the trial court allowed hearsay testimony from Rick Ortega's former girlfriend Christine Salaices. Christine testified that Rick had told her some months before the murder that Rick planned to stab Terri Winchell, and would bring Morales with him because "Mikey wouldn't let him stop." We need not decide whether allowing in this testimony violated the Confrontation Clause, because, even assuming that it did, that error would be harmless. Under *Brecht* the writ cannot be granted for constitutional trial error where, as here, the erroneously admitted testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." [97]

AFFIRMED.

McKEOWN, Circuit Judge, concurring in part and dissenting in part:

The bedrock principles of our Eighth Amendment jurisprudence require that a state's capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). California's scheme does not. The California lying-in-wait special circumstance, which triggers eligibility for the death penalty, has been expanded to such a degree that the line between premeditated murder and capital murder is but an illusory veil. To pass constitutional muster, a sentencing scheme must limit capital murders to a small realm within the universe of ordinary premeditated murders. But in California, like a Venn diagram of nearly overlapping circles, the confluence of lying-in-wait and other types of murder is virtually complete.

The Eighth Amendment analysis required in this challenge to the lying-in-wait provision confronts us with the intersection of a complex sentencing scheme and constitutional concepts that mean different things depending on the context. The questions raised in this appeal cannot be answered by a simplistic syllogism like "Not every ambush has to be from the bushes," maj. op. at 1178, any more than I would suggest one must be lying down to

---

**96.** *See Rich,* 187 F.3d at 1068.

**97.** *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

satisfy the lying-in-wait provision. Nor can they be resolved by applying less rigorous scrutiny taken from our Fifth Amendment precedent. Unfortunately, the majority does both. Although the majority recites the Eighth Amendment, it fails to apply the principal tenets of Eighth Amendment law. The Eighth Amendment requires that the lying-in-wait statute be narrowly construed such that individuals statutorily eligible for the death penalty under the special circumstance—that is, those for whom the jury is even allowed to consider a death sentence—are sufficiently distinguishable from and comprise a significantly narrower class than other murder defendants. Applying the constitutionally mandated level of scrutiny, the California lying-in-wait provision fails.

Michael Morales was found guilty of two special circumstances that made him eligible for the death penalty: torture and lying-in-wait. This Court previously determined that the torture murder special circumstance failed to meet the requirements of the Eighth Amendment. *See Wade v. Calderon,* 29 F.3d 1312, 1320 (9th Cir.1994) (holding that, in the absence of a narrowing construction, "the torture special circumstance would fail to provide a principled basis for distinguishing capital murder from any other murder"). I agree with the majority that the jury's consideration of the torture special circumstance, in the context of this case, was harmless under either a weighing or non-weighing scheme, as long as the lying-in-wait special circumstance is valid. The critical question, then, is whether the lying-in-wait special circumstance comports with the Eighth Amendment, as Morales's death sentence hinges on this special circumstance. This question is more difficult than the majority suggests, and ultimately I cannot agree with either the majority's analysis or its conclusions.

Although I originally concurred in the majority's opinion in full, upon conducting an Eighth Amendment-specific analysis, I can only conclude that the lying-in-wait special circumstance, as construed by California courts, is insufficiently narrow to pass constitutional muster. California's three-prong test for the special circumstance has proven so permissive and penetrable that lying-in-wait murder is nearly indistinguishable from other murders. Upon reflection, and after considering Morales's petition for rehearing and rehearing en banc, along with the brief of amici curiae, I would grant Morales's habeas petition with respect to his sentence. I concur in the majority's opinion denying his petition on the remaining grounds.

## I. FIFTH AMENDMENT VERSUS EIGHTH AMENDMENT ANALYSIS

My disagreement with the majority begins with its conflation of the specificity requirements of the Fifth and Eighth Amendments. In upholding his sentence of death, the majority answers Morales's Eighth Amendment challenge by concluding that the lying-in-wait special circumstance is constitutional because it does not apply to every defendant convicted of murder. *See* Maj. Op. at 1175. Although the inquiry under both amendments asks whether there is a meaningful distinction between those individuals that are eligible for the sentence and those that are not, the two inquiries are substantively dissimilar.

The Eighth Amendment demands that the death penalty not be administered in a way that is cruel and unusual. Towards this end, the criteria that make defendants eligible for the death penalty—which in California are termed "special circumstances"—must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the impo-

sition of a more severe sentence on the defendant compared to others found guilty of murder." *Romano v. Oklahoma,* 512 U.S. 1, 7, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (quoting *Zant,* 462 U.S. at 877, 103 S.Ct. 2733). Eighth Amendment narrowing is also accomplished by the states' "constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Thus, aggravating circumstances must not be unconstitutionally vague. *See Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

Although the Fifth Amendment also demands that laws not be unconstitutionally vague, the vagueness inquiry is not parallel to the Eighth Amendment analysis. Under the Fifth Amendment, due process is satisfied so long as "a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Houston v. Roe,* 177 F.3d 901, 907 (9th Cir.1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).

The difference between the constitutional inquiries applied under the Fifth and Eighth Amendments can be simply stated: the Fifth Amendment only looks for the existence of a line between the categories of murder, whereas under the Eighth Amendment, that line must be drawn in the right place—where capital murder is a small fraction of first degree murder. In other words, a void-for-vagueness challenge under the Due Process Clause asks whether the statutory language distinguishes among classes of murder so that defendants have proper notice, whereas a challenge under the Eighth Amendment's

cruel and unusual punishment clause asks whether the statute sufficiently narrows the application of the death penalty. *Compare Kolender,* 461 U.S. at 357, 103 S.Ct. 1855 (under due process, void-for-vagueness doctrine requires a penal statute to define criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement) and *Houston,* 177 F.3d at 907 (with reference to a due process challenge, the "legislature and courts have created a thin but meaningfully distinguishable line") *with Godfrey v. Georgia,* 446 U.S. 420, 427–28, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (under the Eighth Amendment, capital sentencing scheme must provide a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not).

The questions asked under the two Amendments make it easy to fall prey to mixing and matching the substantive analysis for each. Both look to see if the statutes or the state court's interpretations of the statutes meaningfully distinguish among classes of defendants so that the penalty is not imposed in an arbitrary and capricious manner. But while the two inquiries are linguistically similar, the phrase "meaningfully distinguish" assumes significantly different meanings under each analysis. By substituting one standard for the other, the majority fails to apply the proper scrutiny to the California lying-in-wait special circumstance.

Although the majority opinion does not cite to *Houston* in its Eighth Amendment analysis, the majority's reasoning suggests a reliance on *Houston's* Fifth Amendment vagueness analysis when it attempts to demonstrate that the lying-in-wait special circumstance passes Eighth Amendment scrutiny simply because murder scenarios

exist that would fall outside the lying-in-wait criteria. This reasoning misses the point of the Eighth Amendment requirement of narrowness. In *Houston,* we concluded that, for Fifth Amendment purposes, the difference between murder *while* lying in wait, under the special circumstance, and murder *by means of* lying in wait, under the first degree murder provision, constitutes "a thin but meaningfully distinguishable line between first degree murder lying in wait and special circumstances lying in wait." 177 F.3d at 907. The majority acknowledges that *Houston* did not consider an Eighth Amendment challenge, but nonetheless invokes the logic of *Houston* to uphold the constitutionality of this particular death eligibility criterion under the Eighth Amendment. This approach, although semantically smooth, is flawed.

*Houston's* Fifth Amendment analysis cannot be stretched so wide that it swallows Morales's Eighth Amendment claim. Although the majority is correct that Morales's *Fifth Amendment due process* argument is foreclosed by *Houston,* the *Houston* court never reached the *Eighth Amendment cruel and unusual punishment* question. Houston in fact lacked standing to bring such a challenge because he was not sentenced to death. *Id.* at 905. As *Houston* expressly acknowledged, a Fifth Amendment challenge to a death penalty sentencing scheme differs significantly from an Eighth Amendment challenge. *Id.* at 907–08 & n. 1. (declining to reach Eighth Amendment challenge to application of the death penalty but deciding Fifth Amendment void-for-vagueness challenge).

The Supreme Court's decision in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), illustrates the distinction between the levels of scrutiny under each challenge. In *Maynard,* the Court considered an Eighth Amendment challenge to Oklahoma's "especially heinous, atrocious, or cruel" statutory aggravating circumstance, which makes a defendant eligible for the death penalty. In its defense, the State argued that the statutory provision was not unconstitutionally vague because certain classes of convicted murderers would fall outside its definition. The Court rejected this approach: "The difficulty with the State's argument is that it presents a Due Process Clause approach to vagueness and fails to recognize the rationale of our cases construing and applying the Eighth Amendment." *Id.* at 361, 108 S.Ct. 1853.

Here, the majority adopts the rationale rejected in *Maynard.* The majority posits that the California lying-in-wait special circumstance does not violate the Eighth Amendment because the special circumstance "embraces some first-degree murders, but not all." Maj. Op. at 1175. This rationale mistakes the Fifth Amendment for the Eighth Amendment and ignores the differences between the requirements of the two amendments. Although *Houston* found a "thin but meaningful distinction" with respect to the due process problem of notice, the due process bar is not only different but is also lower than what the Eighth Amendment requires under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny. That is, a statute may very well satisfy due process because adequate notice only demands that statutes distinguish crimes in a way that "embraces some ... but not all." But the very same statute would nonetheless fail to meet the requirements of the Cruel and Unusual Punishment Clause if it does not "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. 2733.

The majority's reliance on *Tuilaepa v. California* does not cure its problematic bootstrapping of the Fifth Amendment vagueness analysis. Despite the logical neatness with which the majority attempts to present the relationship among *Houston, Tuilaepa*, and the present case, the analysis is not parallel. *Tuilaepa* considered and rejected a narrowness challenge against jury discretion in sentencing a defendant to death during the penalty phase, not a narrowness challenge against eligibility for the death penalty. 512 U.S. at 980, 114 S.Ct. 2630. No special circumstance was at issue, and thus the case does not inform our understanding of what the Eighth Amendment requires with respect to death eligibility—the issue now before us.

Because the concept of narrowness is so crucial to proper Eighth Amendment scrutiny, as well as in distinguishing *Tuilaepa*, a few words of background are helpful. The Eighth Amendment requires that the types of conduct that render a defendant eligible for the death penalty must be sufficiently narrow to result in a significantly small subclass of murder defendants who qualify for death penalty consideration. This narrowing occurs at a stage known as "death eligibility." The Eighth Amendment also requires that the actual selection of the death penalty as punishment for an individual defendant must meet certain criteria, such as having proper consideration of aggravating and mitigating circumstances. This narrowing occurs at a stage known as "death selection." Although the Eighth Amendment demands that capital sentencing schemes sufficiently narrow the possible application of the death penalty at both death eligibility and death selection, the concept of narrowness takes on different forms of analysis during the two stages.

At the first stage, eligibility for the death penalty must be restricted to a class of crimes in which death is a proportionate punishment. *See, e.g., Coker v. Georgia*, 433 U.S. 584, 595–96, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death penalty as punishment for rape unconstitutional). Eligibility for the death penalty is not a matter of juror discretion. "Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'" *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. 2630 (quoting *Arave v. Creech*, 507 U.S. 463, 471, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)).

At the second stage, the Eighth Amendment requires the actual selection of the death penalty for a particular defendant be based upon an individualized determination directed to the individual and the circumstances of the crime. *See Lockett v. Ohio*, 438 U.S. 586, 601, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Because of the constitutional demand for greater consideration of the individual at the selection phase, state sentencing schemes must afford juries greater discretion in the selection phase than the eligibility phase. *See Tuilaepa*, 512 U.S. at 973, 114 S.Ct. 2630.

Thus, narrowing is achieved in different ways at the two stages, and as a result, analysis of death selection in *Tuilaepa* cannot serve as a substitute for the required analysis of death eligibility. Nor is the fact that a statute fulfills the requirements of due process, as in *Houston*, dispositive of whether it is sufficiently narrow to meet Eighth Amendment standards. It is thus improper to extend the "thin but meaningful" distinction of *Houston* and not separately analyze whether the lying-in-wait special circumstance is sufficiently narrow under the Eighth Amendment. I turn now to that analysis.

## II. EIGHTH AMENDMENT ANALYSIS: DEATH ELIGIBILITY IN CALIFORNIA

Morales argues that the lying-in-wait special circumstance is unconstitutional under the Supreme Court's Eighth Amendment jurisprudence. I agree. The California Supreme Court's formulation of the limiting construction is so porous that it fails to strain out non-death eligible murders in a constitutionally meaningful way. *See People v. Morales*, 48 Cal.3d 527, 257 Cal.Rptr. 64, 770 P.2d 244 (1989).

### A. SCOPE OF REVIEW

Review of an Eighth Amendment narrowing challenge is constrained by the Supreme Court's decision in *Arave v. Creech.* At issue in *Arave* was an Eighth Amendment challenge to Idaho's death penalty statute, which made a "cold-blooded, pitiless slayer" death eligible. The Court upheld the statute because the Idaho Supreme Court had adopted a limiting construction that satisfied constitutional requirements. *See Arave*, 507 U.S. at 471, 113 S.Ct. 1534.

In rejecting a claim that Idaho failed to apply its limiting construction consistently, the Court cautioned: "Under our precedents, a federal court may consider state court *formulations* of a limiting construction to ensure that they are consistent. But our decisions do not authorize review of state court cases to determine whether a limiting construction has been *applied* consistently." *Id.* at 477, 113 S.Ct. 1534 (emphasis in original). That is, a reviewing court may not consider a claim of unconstitutionality on the grounds that other defendants with similar circumstances did not receive like sentences. But it remains the ardent and unmitigated duty of a reviewing federal court to ensure that state courts construe death penalty sentencing schemes in consonance with the Constitution. *See, e.g., Sochor v. Florida,* 504 U.S. 527, 536–37, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992).

### B. CALIFORNIA'S FORMULATION OF ITS LIMITING CONSTRUCTION

The California death penalty statute under which Morales was convicted provides that anyone found guilty of murder in the first degree shall be punished by death or life without parole if "the defendant intentionally killed the victim while lying in wait." Cal.Penal Code § 190.2(a)(15) (1989). The California Supreme Court applies a three-pronged limiting construction of the lying-in-wait special circumstance. Murder committed while lying-in-wait must contain the following elements: (1) a concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act; and, (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. *See People v. Morales,* 257 Cal.Rptr. 64, 770 P.2d at 260–61. Yet, far from creating "a factual matrix sufficiently distinct from 'ordinary' premeditated murder," *id.* at 261, the lying-in-wait special circumstance reaches so far that it encompasses almost all lying-in-wait first degree murders, and as a result, also includes most premeditated murders. That is, there is virtually no line between premeditated murder and lying-in-wait first degree murder, and likewise virtually no line between lying-in-wait first degree murder and the special circumstance. Whereas the Constitution demands a funnel narrowing the pool of defendants eligible for the death penalty, California gives us a bucket. Indeed, the California Supreme Court has instructed that the lying-in-wait circumstance, as outlined in the standard jury instructions, is "the functional equivalent of proof of premeditation, deliberation and intent to kill." *People v. Ruiz,* 44 Cal.3d 589, 244 Cal.Rptr. 200, 749 P.2d 854, 867 (1988).[1]

1. The majority criticizes the reliance on cases that deal with lying-in-wait first degree

The "concealment of purpose" prong has proven so malleable that it fails to narrow significantly the class of defendants eligible for the death penalty. And the "watching and waiting" prong, as construed by the California Supreme Court, makes it indistinguishable from any other premeditated murder. All that remains is the third prong, the "surprise" element, which, because of the way it has been interpreted, overlaps with the first prong. To me, a test in which almost anyone found guilty of premeditated murder satisfies all three parts is no test at all, and provides "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey*, 446 U.S. at 433, 100 S.Ct. 1759.

Ironically, the concealment prong, which by virtue of plain English adheres to the conventional and ordinary understanding of lying-in-wait as ambush, *see e.g., People v. Merkouris*, 46 Cal.2d 540, 297 P.2d 999, 1011–12 (1956), has been expanded rather than narrowed by the California courts. Instead of the traditional rule that lying-in-wait requires evidence of physical concealment or surprise, California has no definitive requirement for actual physical concealment. *See Morales*, 257 Cal.Rptr. 64, 770 P.2d at 259 ("[T]he concealment element 'may manifest itself by either an ambush or by the creation of a situation where the victim is taken unawares *even though he sees his murderer.*' ") (emphasis in original); *see also People v. Sutic*, 41 Cal.2d 483, 261 P.2d 241, 245–46 (1953) (concealment in ambush unnecessary). Rather, the concealment portion of the lying-in-wait test is satisfied by the concealment of purpose, not physical concealment. *See Morales*, 257 Cal.Rptr. 64, 770 P.2d at 259; *see also People v. Tuthill*, 31 Cal.2d 92, 187 P.2d 16, 21 (1947). Thus, the cases preceding *Morales* established that the concealment criterion extended to more than mere ambush, as the term is commonly understood. Concealment, it turns out, can sometimes mean no more than a murderer's failure to announce his intentions or a desire to conceal the murderous plan from the victim. What, then,

---

murder as opposed to the lying-in-wait special circumstance, suggesting that the discussion in this section "relies on mistaken use of quotations and citations pulled out of context from some California cases." Maj. Op. at 1176. But as we and the California Supreme Court have noted before, the only discernable difference between the two lying-in-wait provisions was that the special circumstance requires the murder be committed "while" lying in wait—a distinction the California Legislature has since removed. *See Houston*, 177 F.3d at 907; *People v. Gutierrez*, 28 Cal.4th 1083, 124 Cal.Rptr.2d 373, 52 P.3d 572, 612–13 (2002). Thus, it is entirely appropriate to look at how California distinguishes between ordinary premeditated murder, lying-in-wait first degree murder, and the lying-in-wait special circumstance.

What the majority fails to acknowledge is that the divisions along this spectrum are indiscernible, and are certainly not the kind of genuine narrowing required by the Eighth Amendment. Although, at the time Morales was convicted, the first degree murder provision and the special circumstance were separated by the paper-thin limiting construction that the murder occur "while" lying in wait, other prongs of the lying-in-wait test are identical. For example, in *People v. Edwards*, 54 Cal.3d 787, 1 Cal.Rptr.2d 696, 819 P.2d 436 (1991), which is a special circumstances case, the California Supreme Court held that there is no difference in the temporal requirement between the special circumstance and the first-degree murder provision. *Id.* at 474 n. 16. Indeed, the *Edwards* court relied on *People v. Ruiz*, 44 Cal.3d 589, 244 Cal.Rptr. 200, 749 P.2d 854 (1988), a lying-in-wait first degree murder case, to interpret the special circumstance provision. Considering that the California Supreme Court itself recognizes the interchangeableness of the two provisions, I see no reason why we should not look to lying-in-wait first degree murder cases for California's construction of the same prongs in the special circumstance.

is the difference between concealment and surprise?

But even concealment of purpose is not always necessary, as subsequent cases demonstrate. In *People v. Hillhouse*, the California Supreme Court held that a defendant could be death eligible under the lying-in-wait special circumstance despite the fact that he announced his purpose to his victim, stating "I ought to kill you" prior to committing the murder. 27 Cal.4th 469, 117 Cal.Rptr.2d 45, 40 P.3d 754, 775 (2002). Under this recent iteration of the rule, criminal defendants meet the concealment test regardless of whether they are hidden or seen, and even whether they conceal their intentions or reveal them. Thus, rather than curing the overbreadth of the first part of the lying-in-wait test, subsequent cases manifest the same if not more problematic infirmities than those that existed before Morales's case.

The second element of the limiting construction is even more permeable than the first. California requires "a substantial period of watching and waiting for an opportune time to act." [2] *People v. Morales*, 257 Cal.Rptr. 64, 770 P.2d at 261. The paradigmatic understanding of watching and waiting would require—as the term suggests-an actual period of time spent waiting. Although imposing a specific quantum of time may prove both unneces-

sary and impractical, the Eighth Amendment requires death eligibility factors to include at least some means of distinguishing death penalty cases from others.

Despite the need to distinguish cases eligible for the death penalty, the California Supreme Court has consistently construed the temporal requirement of the lying-in-wait circumstance to be no more than that of ordinary premeditated or deliberate murder. Thus, in *People v. Ruiz*, 244 Cal.Rptr. 200, 749 P.2d at 866 n. 3, the court reaffirmed the constitutionality of the lying-in-wait murder provision: "The lying-in-wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." The formulation is the same for the lying-in-wait special circumstance. *See Edwards*, 1 Cal.Rptr.2d 696, 819 P.2d at 474 n. 16. Indeed, this broad construction of the "watching and waiting" requirement is identical to the definition of lying-in-wait given in the standard jury instruction at the time of Morales's conviction.[3]

Both the standard jury instructions regarding the lying-in-wait special circumstance and the California court's construction of the test lead to the conclusion that any premeditated or deliberate murder would satisfy the watching and waiting requirement. Under such a construction,

---

**2.** Even the "watchful and waiting" element-perhaps the essence of lying-in-wait-has failed to restrain the applicability of the special circumstance. A defendant need not actually watch the victim, as long as he is watchful, or "alert and vigilant," while waiting. *See People v. Sims*, 5 Cal.4th 405, 20 Cal.Rptr.2d 537, 853 P.2d 992, 1007–08 (1993). Yet, paradoxically, a defendant can be "alert and vigilant" even if he falls asleep while waiting for his intended victim. *See People v. Tuthill*, 187 P.2d at 21.

**3.** The standard jury instructions for the lying-in-wait special circumstance explicitly incor-

porates by definition the instructions for lying-in-wait murder. *See* CALJIC 8.81.15. Those instructions read:

> The term 'lying-in-wait' is defined as waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying-in-wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

CALJIC 8.25 (West 4th Rev. Ed.1979).

the second part of the so-called limiting construction is without any limiting parameters.

The third and final element of California's three-part test requires the defendant to attack by surprise from a position of advantage. The California Supreme Court held that Morales satisfies this prong of the limiting construction because he was sitting behind the victim in a car. Under the loose construction of the first and second parts of the lying-in-wait test, Morales's eligibility for the death penalty ultimately turns on whether he killed his victim by surprise. That is, even after a jury applies the first and second parts of the lying-in-wait test, the question of surprise is all that remains as a truly narrowing factor. And yet, taking a page from the California courts' book on concealment, surprise apparently can be nothing more than concealment of purpose. Standing alone, I fail to see how this singular factor significantly narrows the pool of defendants eligible for the death penalty, and for that reason, it is not a proper litmus test for death eligibility under the Eighth Amendment.

The majority provides examples of cases in which the lying-in-wait special circumstance would not apply, and suggests that the scheme is overbroad only if "unimaginative" about the way murders are committed. Maj. Op. at 1176. I do not dispute that, with imagination and creativity, one can explain away the constitutional infirmities of the California death penalty. But that is beside the point. Under the Eighth Amendment, it is not enough that a death penalty statute applies to some but not all murder defendants. Rather, the inquiry is whether the statute is narrow enough-whether the subclass of death eligible defendants is sufficiently smaller than the overall class of murder defendants. See Maynard, 486 U.S. at 361, 108 S.Ct. 1853. The majority's litany of exam-ples underscores precisely the way in which the majority misconstrues the Eighth Amendment inquiry. By applying Fifth Amendment scrutiny to Morales's Eighth Amendment challenge, the majority is able to sidestep the long reach of California's construction of the lying-in-wait provision.

Under the California Supreme Court's broad interpretation, it is difficult to see how the limiting construction selects those more deserving of the ultimate punishment. See Zant, 462 U.S. at 877, 103 S.Ct. 2733. To the extent that the special circumstance can be said to limit death eligibility, it does so in an arbitrary and capricious manner. See Godfrey, 446 U.S. at 428, 100 S.Ct. 1759. The lying-in-wait special circumstance has expanded so far beyond a constitutional foundation that it collapses under its own volume. Indeed, several commentators have underscored the infirmity of the California scheme. See Steven F. Shatz & Nina Rivkind, The California Death Penalty Scheme: Requiem for Furman?, 72 N.Y.U. L.Rev. 1283 (1997); Garth A. Osterman & Colleen Wilcox Heidenreich, Note, Lying in Wait: A General Circumstance, 30 U.S.F. L.Rev. 1249 (1996). And in benchmarking the breadth of the scheme, it is useful to reference the words of one of our colleagues: "The majority must come to realize . . . [i]ncreasing the number of crimes punishable by death, widening the circumstances under which death may be imposed . . . will not do a single thing to accomplish the objective, namely to ensure that the very worst members of our society . . . are put to death." Alex Kozinski & Sean Gallagher, Death: The Ultimate Run–On Sentence, 46 Case W. Res. L.Rev. 1, 29 (1995).

Absent proper limiting by the California courts, the lying-in-wait special circumstance does not survive Eighth Amendment scrutiny because it fails to narrow

sufficiently the class of people eligible for the death penalty. For these reasons, I respectfully dissent with respect to the determination of death penalty eligibility.