**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS FRANCIS EDWARDS,
          *Petitioner-Appellant,*

v.

ROBERT L. AYERS, JR.,* Warden,
California State Prison at San
Quentin,
          *Respondent-Appellee.*

No. 05-99001

D.C. No.
CV-93-07151-CJC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
September 26, 2007—Portland, Oregon

Filed September 9, 2008

Before: Mary M. Schroeder, Barry G. Silverman, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Schroeder

---

*Pursuant to Fed. R. App. P. 43(c)(2), Robert L. Ayers, Jr., the current custodian, is substituted for Jill Brown as Warden of the California State Prison at San Quentin.

## COUNSEL

Joseph Schlesinger, Sacramento, California, for the petitioner-appellant.

Garrett Beaumont, San Diego, California, for the respondent-appellee.

## OPINION

SCHROEDER, Circuit Judge:

*Overview*

This is a death penalty appeal by California state prisoner, and crack marksman, Thomas Francis Edwards. Edwards' disturbed behavior and mental problems were apparent from early childhood. Expelled from numerous residential schools, he was committed to Maryland's Patuxent Institution For Defective Delinquents at the age of nineteen and was confined there for fourteen years. More than a decade of psychological treatment at the Patuxent Institution failed to help him. Although Patuxent staff believed Edwards still to be dangerous, Maryland changed its indeterminate sentencing laws and released Edwards in 1977.

In 1981, Edwards spotted two 12-year old girls heading out of a California campground alone for a picnic; he followed them in his truck, waited until they reached a remote spot, drove up alongside them, stopped his truck, called "Girls," and shot each of them in the head, killing one and seriously injuring the other. He was convicted in 1983 of first degree murder, with the special circumstance of "lying in wait," that qualified him for the death penalty. He was sentenced to death by a penalty phase jury in 1986 after two penalty phase mistrials. Neither at the guilt phase nor at the penalty phase was the jury informed of Edwards' pre-1977 history.

At the penalty modification hearing, his counsel sought reduction of the penalty by the trial judge on the basis of Edwards' pre-1977 history, specifically Edwards' lifelong history of mental problems and disturbed behavior dating from early childhood. Counsel explained he had not presented this evidence to the jury because, to use counsel's description, it was too "bizarre." The trial court declined to modify the penalty, noting that even if it had the power to reduce the pen-

alty on the basis of evidence that was not before the jury, it would not do so because the evidence was even more damaging than the evidence that the jury had heard.

The case wended its way through direct appeal and state collateral proceedings, then languished in the district court pending approval of investigatory funding that preceded an extensive evidentiary hearing. In denying the petition in 2005, the district judge who had inherited the case observed that in his opinion the crime was "horrible" and the "procedural history of this case is one of 'extended delay reminiscent of that described in Charles Dickens's Bleak House.' "

Edwards' appeal essentially boils down to four issues: 1, whether the "lying in wait" special circumstance instruction was overbroad in failing adequately to distinguish Edwards' case from non-death eligible first degree murders; 2, whether Edwards was prejudiced by the prosecution's failure to disclose the complete Patuxent file, *see Brady v. Maryland*, 373 U.S. 83 (1963); 3, whether trial counsel was ineffective in not presenting a diminished capacity defense at the guilt phase; and 4, whether trial counsel was ineffective in not presenting Edwards' lifelong history of mental problems and disturbed behavior as mitigating evidence at the penalty phase. We affirm the district court's denial as to each issue.

The claimed instructional error is not materially distinguishable from the one we rejected in *Morales v. Woodford*, 388 F.3d 1159, 1173-78 (9th Cir. 2004), *certiorari denied*, *Morales v. Brown*, 546 U.S. 935 (2005). We are bound by that decision.

The prosecution did not disclose the complete Patuxent file, but sufficient Patuxent records were already in defense counsel's possession for him to know the nature of the file's contents. We agree with the district court that there is no reasonable probability of a different result at guilt or at penalty if the prosecution had disclosed to defense counsel the

entire Patuxent file. Indeed, defense counsel had moved to exclude any reference to Edwards' fourteen-year confinement at Patuxent because he knew the content of the records from those years was so damaging. The district court agreed with that assessment, as do we.

Trial counsel fully investigated Edwards' history and had Edwards evaluated by at least four mental health experts who found no support for a mental defense. Trial counsel was not ineffective for failing to present a diminished capacity defense that was not supported by his experts and was negated by the circumstances of the crime.

Nor was trial counsel ineffective for failing to present Edwards' lifelong history of mental problems and disturbed behavior as mitigating evidence at the penalty phase. Edwards' history of disturbed behavior, his lack of response to treatment, and his escalating rage against women — as documented in the Patuxent file — is highly aggravating in its own right. In addition, it would open the door to even more damaging evidence of Edwards' bizarre behavior, specifically his longstanding hair and neck fetish and his violent and sadistic sexual fantasies, all of which suggest "some sort of sexual object to these shootings" as the trial judge stated when denying Edwards' motion to modify the penalty.

## Factual Background

### A. *The Crime*

On September 19, 1981, at approximately 2 p.m., Vanessa Iberri and Kelly Cartier, two 12-year old girls, were inside Blue Jay Campground walking towards the entrance/exit on their way to a picnic site that they had chosen earlier that day. Kelly saw a red truck with a white camper shell enter the campground. (Another camper saw a red truck with a white camper shell in the campground three hours earlier that day.) The man in the truck looked in the direction of Vanessa and

Kelly and then drove past them. The girls walked out of the campground. Two to three minutes after the girls left, another camper saw the red truck leave the campground.

After the girls had walked about a quarter of a mile, Kelly heard a vehicle behind them and told Vanessa to move to the side of the road. A truck approached. Kelly could see that it was the same red truck, driven by the same man, that she had seen in the campground. The truck drove up alongside the girls. The man inside the truck called "Girls," the girls turned their heads, and the man fired two shots. The first shot struck Vanessa between her eyes. Kelly turned her head away and the second shot grazed the side of her skull. Vanessa and Kelly both fell to the ground. Kelly saw the man run to the back of his truck, heard a slam, and then saw the man run to the front of his truck, jump in, and take off.

At that point other campers, Charles Vaughn and his party, were leaving the Blue Jay campground just after 2 p.m. to collect firewood. Larry Ellis was driving and Vaughn was in the passenger seat. Vaughn's brother-in-law, Terrell Livezey, was following behind them in another truck. From across a meadow, Vaughn noticed a man running from the front to the back of a red truck. Vaughn radioed to Livezey that he thought the man was poaching deer and told Ellis to drive in that direction.

When they drove around a curve, Vaughn and Ellis saw the man jump into his red truck and take off, and they saw the girls down on the side of the road. Thinking there had been a hit and run, Vaughn and Ellis chased after the red truck while Livezey stopped to help the girls. Vaughn and Ellis got close enough to the truck to record its license plate number, 1BJX675, but after a high speed chase, the man in the red truck got away. The truck with that license plate number was registered to Edwards but an extensive manhunt, over many days, failed to locate him.

Vanessa died two days after life support was removed; the doctor who performed the autopsy and retrieved the bullet from Vanessa's brain testified there was no chance of a person surviving such a wound. Kelly survived.

On September 28, 1981, Edwards was arrested in Maryland. Bus tickets dating from September 24 to September 27, with destinations from Los Angeles to Washington D.C., were found in his motel room. Edwards' truck was found in a parking lot near a bus station in Los Angeles. The camper portion of the truck contained six firearms (two handguns, two shotguns, and two pistols), none of them loaded, and two to three thousand rounds of ammunition, including .22 caliber bullets. Three additional weapons (two rifles and a revolver) were found in Edwards' locked storage area at the South Coast Gun Club where Edwards worked and lived. Edwards was an excellent marksman; he could repeatedly hit a target the size of a chicken from fifty yards.

Edwards had visited the Blue Jay Campground often and was very familiar with the area. The scene of the shooting was relatively isolated, approximately halfway between the Blue Jay campground and a neighboring campground. More than a quarter of a mile separated the spot where Edwards passed the girls the first time and the spot where he shot them.

Two .22 caliber casings were found at the scene of the crime. None of the weapons found in Edwards' truck fired the fatal shot. Bobby Pamplin, a South Coast Gun Club member, testified that two or three weeks before September 19, 1981, he sold Edwards a .22 caliber Ruger semiautomatic pistol. The parties stipulated that the .22 bullet shell casings found at the scene of the crime could have been fired from a .22 Ruger semiautomatic pistol.

At trial, deputy sheriff Greg Allen testified that just before Edwards' 1983 trial began, Edwards told him: "Off the record, I'm guilty. I don't know why I shot those two little

girls. I'm guilty as sin. I'm depressed for what I put their families through." Kelly recovered from surgery to alleviate a hematoma that developed under her skull. She testified at trial that Edwards was the shooter.

## B. *Trial*

At trial, Edwards did not dispute that he had shot the girls. The defense maintained that Edwards had not premeditated the shootings. The parties stipulated that Edwards' divorce became final on August 11, 1981. The shootings occurred on September 19, 1981. Lay witnesses testified that Edwards was depressed due to his recent divorce, but no mental health expert testified on Edwards' behalf. The jury convicted Edwards of one count of first degree murder and one count of attempted murder and found true the special circumstance that Edwards committed the murder while lying in wait.

At the penalty phase, counsel presented an aberrant act defense. Twenty-five witnesses testified that they were shocked that Edwards could have committed such a crime, as he was a reliable and likable friend or co-worker whom they trusted with their children and who had never expressed any hostility toward children. Sheriff's deputies called by the defense testified that Edwards was a good prisoner who never caused any trouble. Apart from lay witnesses who testified that Edwards was depressed due to his divorce and his lack of a home, no troubled life history or mental health evidence was presented at the penalty phase. Edwards' first penalty jury hung with three jurors voting for life without the possibility of parole. Edwards represented himself at the second penalty trial, and the jury returned a verdict of death. That verdict, however, was vacated when a counseled motion for a new penalty trial was granted; Edwards' counsel successfully argued that the trial court had erred at the second penalty trial in admitting the testimony of Charlotte Tibljas. She had visited Edwards in jail and received a note from him concerning his strange, violent sexual fantasies. Because of her men-

tal condition, the court deemed her testimony about jail conversations to have been unreliable.

At the third penalty trial in 1986, Edwards' counsel successfully moved to bar the prosecutor in his case-in-chief from referring to Edwards' fourteen-year confinement at Patuxent. After three days of deliberations, the jury returned a verdict of death.

At the penalty phase modification hearing in 1986, Edwards' counsel presented to the trial court extensive evidence of Edwards' mental health history and troubled background dating from early childhood, including his fourteen-year confinement at Patuxent. Counsel explained to the court that he had not presented this evidence to the jury because the evidence was too "bizarre." Counsel argued for reduction of Edwards' death sentence to life imprisonment without parole due to his lifelong history of mental problems and disturbed behavior. Counsel urged the court to reduce Edwards' sentence on the ground that "this killing is an outgrowth of a mental illness . . . observed since day one" and death is not the right punishment for someone "who has been sick from the day he was born, who help was sought for and help can't be provided."

The trial court ruled it had no power to consider evidence not presented to the jury, but even if it had, it would not set aside the jury's verdict of death because the evidence was more damaging than mitigating. The court described the evidence as suggesting there was "some sort of sexual object to these shootings."

C. *Procedural History*: *Appeal and Post-Conviction Petitions*

The California Supreme Court on direct appeal rejected Edwards' claim that the lying in wait special circumstance instruction was unconstitutional. It affirmed Edwards' convic-

tion, upheld the death sentence, and agreed that the trial court, when ruling on the motion to modify the sentence, had no power to consider evidence not presented to the jury. *See People v. Edwards*, 819 P.2d 436 (Cal. 1991).

In habeas proceedings, habeas counsel discovered that one week before the conclusion of Edwards' third penalty trial, the Orange County Sheriff's Department had obtained from Maryland authorities Edwards' complete 448-page file from the Patuxent Institution, but the prosecution never disclosed that file to the defense. Edwards' constitutional claim was denied in state habeas proceedings. The California Supreme Court eventually denied habeas relief on all of Edwards' claims. *See In re Thomas Francis Edwards*, No. S030742, Sept. 15, 1993 Order; *see also In re Thomas Francis Edwards*, No. S092074, Nov. 15, 2000 Order.

After extensive evidentiary hearings conducted first by Judge Hupp and later, after Judge Hupp's death, by Judge Carney, the federal district court denied relief in a thorough, 138-page order by Judge Carney. The district court granted a certificate of appealability only as to the claim of "lying in wait" instructional error. This court additionally certified the *Brady* claim and the two ineffective assistance of counsel claims before us. Briefing has been extensive.

On appeal, Edwards argues that the Antiterrorism and Effective Death Penalty Act ("AEDPA") should not apply to the merits of his claims because AEDPA was enacted while his investigative funding requests were pending in the district court and, but for district court delay, Edwards would have filed a pre-AEDPA petition not governed by AEDPA's higher standards of review. *See, e.g.,* 28 U.S.C. § 2254(d) (prohibiting federal relief unless state court decision was contrary to, or objectively unreasonable application of, clearly established Supreme Court law). We do not need to decide this issue. Each of Edwards' claims fails on its merits under either standard.

*Analysis*

## A.  *Instructional Error*

At issue is the "lying in wait" special circumstance instruction given to Edwards' jury at the guilt phase. The jury found that special circumstance true, which rendered Edwards "death eligible." Edwards's jury was instructed as follows:

> The term 'lying in wait' is defined as waiting and watching the victim for an opportune time to act, together with the concealment by ambush or some other secret design to take the victim by surprise. The lying in wait need not continue for any particular period of time, provided that its duration is sufficient to establish beyond a reasonable doubt (1) the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise, and (2) that during the period of lying in wait the defendant had the intention to kill the victim or cause her great bodily harm.

> If a murder is done suddenly, without a period of waiting, watching and concealment, the special circumstance of lying in wait is not present.

> The term 'lying in wait' does not require a showing that the defendant was in a position of lying down. He may be shown to be sitting or standing, and he may be stationary or in motion. The requirement of concealment does not require that the defendant be not visible to the victim, nor that the victim be totally unaware of the physical presence of the defendant. Concealment may be shown by either an ambush or by the defendant's intentional creation of a situation where the victim is taken unawares and by surprise, even though the victim sees the defendant.

> In order to find the special circumstance of lying in wait to be true, you must also find beyond a reasonable doubt that the lying in wait continued up to the moment of the killing, without interruption of time between lying in wait and the act of killing.

The trial court re-instructed the jury during deliberations and corrected the first paragraph of the instruction to strike the phrase "or cause her great bodily harm." At the request of the defense, the trial court also added:

> Before you may find that a murder was committed while lying in wait, the prosecution is required to prove something more than just . . . first degree murder.

*See Edwards*, 819 P.2d at 457-58.

**[1]** It is a constitutional requirement of capital sentencing schemes that they "perform a narrowing function with respect to the class of persons eligible for the death penalty." *See Jones v. United States*, 527 U.S. 373, 381 (1999). An instruction similar to this one has been challenged unsuccessfully in state and federal court for failing to carve out a significant set of death-eligible cases from the entire class of first degree murders. *See People v. Morales*, 770 P.2d 244, 258-61 (Cal. 1989); *Morales*, 388 F.3d at 1173-78; *see also People v. Webster*, 814 P.2d 1273, 1293-94 (Cal. 1991); *Webster v. Woodford*, 369 F.3d 1062, 1073-75 (9th Cir. 2004).

**[2]** To survive a facial challenge under the Eighth Amendment, a special circumstance that makes a defendant eligible for the death penalty must meet two requirements: (1) the circumstance must apply only to a sub-class of defendants convicted of murder, not to every defendant convicted of murder; and (2) the circumstance may not be unconstitutionally vague. *See Morales*, 388 F.3d at 1174, citing *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). In order for "death-penalty eligibil-

ity standards to satisfy the Eighth Amendment's non-vagueness requirement, such eligibility criteria must provide 'a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not.' " *See id.*, quoting *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).

**[3]** This court has upheld the California instruction. We held in *Morales* that California's lying in wait special circumstance instruction as interpreted by the California Supreme Court does sufficiently narrow the class of first degree murders to satisfy the Eighth Amendment. *See Morales*, 388 F.3d at 1173-78. In *Webster*, we had earlier held that the California Supreme Court did not unforeseeably expand the lying in wait special circumstance when it held that actual physical concealment is not required. *See Webster*, 369 F.3d at 1073-75.

Edwards acknowledges that *Morales* and *Webster* are binding. He attempts to differentiate his case from *Morales* by contending the instruction given at his trial was unconstitutional as applied to his case.

The instruction approved in *Morales* defined lying in wait as requiring: (1) a substantial period of waiting and watching for an opportune time to act; (2) concealment of purpose; and (3) immediately thereafter a surprise attack on an unsuspecting victim from a position of advantage. *See Morales*, 388 F.3d at 1175. Edwards maintains the lying in wait instruction given at his trial did not require a "substantial period" of waiting and watching, nor a concealing "act," nor "a position of advantage." Thus, according to Edwards, he was found death eligible under a definition of lying in wait that Edwards contends is so broad and encompasses such a large class of first degree murders that it fails to survive Eighth Amendment scrutiny because it would include surprise attack murder.

We can see no meaningful difference between the instruction given at Edwards' trial and the instruction approved in

*Morales.* A surprise attack murder would not satisfy the lying in wait instruction given at Edwards' trial or in *Morales.* Edwards is correct that the lying in wait instruction given at his trial did not include the words "a substantial period" of waiting and watching. As the California Supreme Court noted, this is not surprising as Edwards' trial pre-dated the *Morales* opinion. *See Edwards*, 819 P.2d at 458. Edwards' jury was instructed, however, that the period of waiting and watching had to be of sufficient duration to prove beyond a reasonable doubt the elements of waiting, watching, and concealment, and that the defendant intended to kill the victim during the period of lying in wait. In addition, the jury was expressly instructed that a "sudden murder" was not a lying in wait murder. We agree with the California Supreme Court that these requirements necessarily conveyed a "substantial temporal element." *See Edwards*, 819 P.2d at 458 (noting that "a certain minimum period of time" for waiting and watching had never been required, only a period of time "not insubstantial").

Edwards maintains that the instruction failed to require a concealing act by Edwards that created the surprise but instead permitted lying in wait to be premised on the sole fact that the victim was surprised. We disagree. The instruction clearly required an act by the defendant. The instruction stated that concealment may be shown by either an ambush "or by the defendant's intentional creation" of a situation where the victim is taken unawares and by surprise.

The lying in wait instruction approved in *Morales* required a surprise attack on an unsuspecting victim "from a position of advantage." Although Edwards is correct that the "position of advantage" wording was omitted from the instruction given at his trial, the omission is of no consequence. As the California Supreme Court concluded, the instruction given at Edwards' trial required either an ambush or a situation where the victim is taken unawares and by surprise, combined with

an intent to kill that "necessarily places the intended killer in a position of advantage." *See Edwards*, 819 P.2d at 458.

[4] The differences in the words used in the lying in wait instruction approved in *Morales* and the instruction given at Edwards' trial are not meaningful because the essential elements are the same. The special circumstance instruction given at Edwards' trial did not permit a finding of lying in wait merely because the victim was surprised. The special circumstance instruction required the jury to find that Edwards waited and watched for an opportune time to act, with the intent to kill the victim, together with concealment by either ambush or his intentional creation of a situation where the victim was taken unawares and by surprise. The jury was properly instructed on lying in wait.

Although Edwards argues that the instruction does not carve out a sufficiently significant set of first degree murders, many first degree murders come immediately to mind which would not be encompassed by this instruction. Examples include murder by poison, murder in the course of a burglary, murder during a bar-room fight, or murder decided upon after a sexual assault, to name but a few. Moreover, as Edwards concedes, we are bound in any event by *Morales,* which rejected the claim that California's lying in wait special circumstance is so broad that it violates the Eighth Amendment.

B. *The Brady Claim*

[5] Suppression by the prosecution, whether willful or inadvertent, of evidence favorable to the accused and material to either guilt or punishment violates the Constitution. *See Brady*, 373 U.S. at 87. Evidence is material to guilt or punishment, however, only if there is a reasonable probability, had the evidence been disclosed to the defense, that the result of the proceeding would have been different. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999). The material allegedly wrongfully withheld in this case was the complete file that the

Patuxent Institution compiled on Edwards over the fourteen-year period that he was confined there from 1963 to 1977.

At the third penalty trial in 1986, defense counsel successfully moved to bar the prosecutor in his case in chief from referring to Edwards' confinement at Patuxent. Both the prosecution and defense previously had relied upon representations by the Maryland State Attorney's Office and the Circuit Court of Montgomery County, Maryland that Edwards' Patuxent file could not be located and apparently had been purged.

One week before the end of the third penalty trial in 1986, Maryland authorities sent the complete Patuxent file to the Orange County Sheriff's Office. The prosecution did not disclose the file to Edwards' counsel. Edwards did not know about it until years after trial, when investigation by habeas counsel uncovered what had occurred.

Edwards now contends that had trial counsel received the complete Patuxent file, trial counsel would have successfully moved for a new guilt phase trial and presented a diminished capacity defense at guilt and a mental health mitigation case at penalty. Edwards insists a reasonable probability of a different result exists at both phases.

The complete Patuxent file included reports and summaries written about Edwards dating from nursery school through his fourteen-year commitment at Patuxent, including psychological and medical reports, progress and incident reports, and Edwards' judicial records. In briefing before this Court, however, Edwards did not clearly identify what records in the complete Patuxent file had not already been independently obtained by, or were not already known to, trial counsel. Furthermore, Edwards has not identified a single significant fact contained in the medical records that counsel did not know and that might have assisted Edwards' experts.

The district court conducted an extensive evidentiary hearing and carefully considered all the evidence that Edwards presented to show that disclosure of the complete file would have been helpful to his defense. The district court concluded in its 138-page order that although the prosecution had failed to disclose the file, far from being helpful to Edwards' case, the Patuxent file would have made a bad situation even worse. As the district court observed, the evidence Edwards contends "should have been presented at trial provides an extremely mixed picture of Mr. Edwards' background and character which, at best, is insufficient to outweigh the heinousness of the crime, and merely reinforces the long history of problems, aggressive behavior, repressed rage and lack of response to treatment which the trial judge found the testimony at the [penalty modification] hearing presented."

Edwards nevertheless contends the Patuxent records would have been invaluable to explain how Edwards' early brain dysfunctions evolved and how they related to his offense. According to Edwards, a neurologist reading the Patuxent records would see they are consistent with Edwards being a classic ventromedial prefrontal lobe patient. According to Edwards' habeas experts, Edwards' impulsivity, his hair fetish, and his hyposexuality are consistent with prefrontal lobe dysfunction, and persons with such dysfunction cannot control their impulses under stress. Had this been explained to the jury, Edwards insists there is a reasonable probability that the jury would have returned different verdicts at both the guilt and penalty phases.

As the district court acknowledged, a history of mental problems and disturbed behavior dating from early childhood is evidence of the kind that could engender sympathy in a jury. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (" 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental

problems, may be less culpable than defendants who have no such excuse' "), quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring); *see also Correll v. Ryan*, ___ F.3d ___, 2008 WL 2039074 *22-26 (9th Cir. May 14, 2008).

**[6]** In this case, however, as the district court found, Edwards' Patuxent file is double-edged. The Patuxent records are "replete with references to Mr. Edwards' 'confused sexual identity' and anger towards women and his mother." Psychological reports in the file describe Edwards as emotionally labile, sexually confused, destructive, and dangerous. Patuxent staff reports note that Edwards has "tremendous rage towards women going back many, many years." The Patuxent file also shows that Patuxent staff strongly recommended that Edwards be recommitted and confined indefinitely because Edwards continued to be dangerous. Maryland's indeterminate sentencing laws, however, changed and Edwards was released in July 1977. We agree with the district court that the complete Patuxent file contained extremely damaging information that on the whole was far more likely to aggravate Edwards' crime in the eyes of the jury.

**[7]** Moreover, if Edwards presented expert testimony to the effect that the shootings were impulsive and attributable to dysfunction of the frontal lobes of his brain as allegedly indicated in Edwards' Patuxent file, thereby using aspects of his history that might engender sympathy, that testimony would open the door to even more damaging evidence. *See People v. Boyd*, 700 P.2d 782, 792 (Cal. 1985) (if defendant offers mitigating evidence, then prosecution rebuttal evidence may be admitted to disprove any fact that is of consequence to the determination of the action). If Edwards were to try to present his troubled background in a sympathetic way, Edwards' experts on cross-examination could be asked if the shootings were related to Edwards' fetish for women's hair, that was amply documented in the complete Patuxent file. Records in that file show that Edwards at about the age of 18 was

arrested for assault after he slashed open a tent where four or five neighborhood girls were sleeping and cut off a girl's ponytail. Edwards was disciplined at Patuxent for making a collage of hair and photos of female staff interspersed with scenes of violence. Police reports indicate that Edwards at the time of his arrest wore a lock of hair around his neck and had plastic baggies of hair in his room. Indeed, at the penalty modification hearing, Edwards' experts agreed that Edwards' interest in women's hair was abnormal, that Edwards had a female neck fetish, and that it was significant that Edwards had wigs and pieces of hair in his room as a child and, when arrested, wore a lock of hair around his neck and kept baggies of hair in his room.

[8] Expert testimony regarding Edwards' alleged brain dysfunction would also open the door to questioning his experts regarding whether the shootings had any relationship to Edwards' violent and sadistic sexual fantasies. (Indeed, Edwards' experts were questioned at the penalty modification hearing about his sadistic sexual fantasies.) Before trial, Edwards' former wife spoke with Orange County Sheriff's officers. She had married Edwards in 1978, one year after his release from Patuxent. She was then eighteen; he was fifteen years older. She told Orange County Sheriff's officers that Edwards liked long hair and liked women's necks. She explained she voluntarily participated in Edwards' elaborate sexual fantasy rituals. She would kneel down and put her head on a wooden chopping block made by Edwards. He would bring a knife down pretending he "was really going to strike [her neck] hard but then he would stop just as [the knife] barely touched the back of [her] neck." Or he would hold an ice pick at the base of her neck and "talk about slowly pushing it up into [her] brain." Other times Edwards pretended to hold a gun to the back of her head or to her temple. Edwards would talk about "taking a knife and stabbing a girl or slitting her throat or chopping the head off;" "watching the girl's face when this was happening;" "holding a gun to the back of the head;" "threatening to pull the trigger;" "the scared look;"

"the panic;" and he would talk about when "he'd start to stab the girl, how the blood just started . . . flowing." According to Edwards' wife, it was the act of killing in the fantasy ritual that aroused Edwards sexually.

Although Edwards argues that the sexual fantasies he communicated to his then wife would be barred at trial by the confidential marital communications privilege, the California Supreme Court in 1993 ruled as a matter of state law that Edwards had waived the privilege by his own repeated selective disclosures of confidential marital communications or by his consent to such disclosures and by injecting his relationship with his former wife into this case. *See In re Thomas Francis Edwards*, No. S030742, Sept. 15, 1993 Order at 2.

**[9]** Expert testimony regarding brain dysfunction would also open the door to questioning Edwards' experts as to whether the shootings were related to Edwards' violent fantasies of beheading and scalping women. Before the end of the second penalty trial, Edwards discussed this fantasy in a note to Charlotte Tibljas, a woman who visited him daily in the Orange County jail. Edwards wrote:

> You are my princess. . . . It will be [my former wife's] head you will hold and [her mother's] scalp to [sic]. Don't think it is all a messy thing. It will be beautiful to [sic] like any other religion. There is a lot of good to some pain. . . . I still want [my former wife's] head and [her mother's] scalp bad. You will learn much more as time goes on.

Although a mistrial was granted after the second penalty trial, when the court ruled that Charlotte's testimony about Edwards was not reliable, the note written by Edwards would be admissible. Indeed, the trial court ruled that in the third penalty trial the prosecutor could use Charlotte's testimony to authenticate the note, but could not introduce her testimony

regarding the note's meaning or her conversations with Edwards.

After Edwards presented his expert witnesses at the penalty modification hearing, the prosecutor argued as follows:

> Why did [Edwards] shoot the girls close up? Why did he stay there after he shot them? Why did he go to the rear of the truck? If you're going to kill someone, why stick around? The most logical reason for the shooting of the two little girls was a sexual one.

If Edwards presented expert testimony that the shootings were attributable to dysfunction of the frontal lobes of Edwards' brain, nothing would prevent the prosecutor from arguing that Edwards shot the girls and prepared to load them in his truck, not due to an explosion of impulsivity caused by brain dysfunction, but as part of his premeditated plan to act out his sexually sadistic rituals. At the penalty modification hearing, one of Edwards' experts even agreed that Edwards may have been intending to load the girls into his truck after shooting them.

**[10]** Because the complete Patuxent file included evidence that was more damaging than helpful, we agree fully with the district court's conclusion that Edwards was not prejudiced by the prosecution's failure to disclose the complete Patuxent file. It would not have been favorable to the defense. That conclusion is compelled by Supreme Court decisions considering such prejudice in the context of a claim of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 525, 535 (2003) (counsel may reasonably decide not to present mitigating evidence which is double-edged), citing *Burger v. Kemp*, 483 U.S. 776 (1987) and *Darden v. Wainwright*, 477 U.S. 168 (1986); *cf. Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (counsel is not ineffective in failing to present psychological evidence which in "its best possible

light . . . is a basket of cobras"). There was no prejudicial *Brady* error.

## C.   *Ineffective Assistance of Counsel Claims*

Edwards contends his counsel was ineffective in failing to present a defense that his mental state precluded a finding of premeditation at the guilt phase, and in failing to argue mental state mitigation at the penalty phase.

### 1.   *Applicable Standards*

**[11]** In order to establish ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

**[12]** When counsel have failed to fulfill their obligation to conduct a thorough investigation of the defendant's background, a failure to uncover and present voluminous mitigating evidence may be unreasonable. *See Wiggins*, 539 U.S. at 522-25. The "principal concern" is "not whether counsel should have presented a mitigation case." *See id*. at 522-23. "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background *was itself reasonable*." *Id*. at 523 (emphasis in original).

**[13]** Failure to present mitigating evidence may be ineffective when counsel "uncovered no evidence in their investiga-

tion to suggest that a mitigation case, in its own right, would have been counterproductive." *Id.* at 525. However, when counsel's investigation discovers little that is helpful and much that is harmful, counsel may reasonably decide to forego presenting evidence of the defendant's background. *See id.*; *see also id.* at 535, citing *Burger,* 483 U.S. at 776, and *Darden*, 477 U.S. at 168.

## 2. *The Investigation*

Although Edwards attempts to minimize the investigation his trial counsel conducted into his mental health history, there was no failure to investigate. District Judge Hupp found that trial counsel thoroughly investigated Edwards' mental health and his social and mental history before deciding not to present a mental state defense. Our review of the record supports that conclusion.

Trial counsel consulted with at least four mental health experts. Before trial, counsel hired Dr. Walsh, a clinical neuropsychologist, to assess Edwards and the question of diminished capacity. Dr. Walsh gave Edwards the Golden battery of neuropsychology tests which she then stated was more than ninety percent accurate in discriminating between brain-damaged and normal subjects. She reported that Edwards tested normal and that a personality test indicated that Edwards was more likely psychiatrically disturbed than cerebrally impaired. Counsel also hired Dr. Starr, an M.D. with special certifications in neurology and psychology at University of California Irvine's neurology department, to assess whether Edwards had a neurological disorder. Dr. Starr, whose interests at that time included distinguishing between psychiatric disorders and organic neurological disorders, evaluated Edwards for neurological abnormalities such as epilepsy or other brain deficits that might provide a defense to, or mitigate, the crime. Dr. Starr knew Edwards had been confined at the Maryland Training School for Unruly Children as well as at Patuxent. Before Dr. Starr conducted his exam, he

took a history from Edwards. Dr. Starr concluded that Edwards' neurological examination results were normal, but that Edwards and his "mental status" were not. Starr recommended a CAT scan, which was done and showed normal results.

Trial counsel hired Dr. Sharma, a psychiatrist, to assess Edwards and the question of his state of mind at the time of the crime. Dr. Sharma knew of Edwards' Patuxent commitment. Dr. Sharma was unable to fit Edwards into any category of the Diagnostic and Statistical Manual of Mental Disorders III ("DSM III"). Although Edwards was disturbed, Edwards' mental illness did not reach the threshold of a mental or psychiatric defense to the crime. Dr. Sharma found no reason to believe that Edwards suffered from a brain disorder.

Trial counsel hired Dr. Klatte, a forensic psychiatrist board certified in both neurology and psychiatry. Counsel gave Dr. Klatte extensive historical information about Edwards, from his early childhood through his commitment at Patuxent, including his history of headaches. Many of the background documents Dr. Klatte received were from Patuxent. Dr. Klatte believed Edwards was mentally ill, but his mental illness was not to a definable level and therefore would not provide a defense to the shooting. Dr. Klatte suspected Edwards' problems were physiologically caused, but tests were run and no physiological basis could be found. Dr. Klatte opined that in ten years "you might understand him more on an organic basis."

**[14]** Edwards' counsel at the time of trial thus relied upon qualified experts who found no evidence of diminished capacity or organic brain damage. There was no violation of counsel's duty to investigate.

3.   *Claim of Ineffective Assistance at Guilt Phase*

Edwards insists that there is a reasonable probability of a different result at guilt had counsel presented a diminished

capacity defense based on frontal lobe dysfunction. Edwards maintains that if experts had explained to the jury that Edwards' lifelong history of mental problems and disturbed behavior indicated dysfunction of the prefrontal lobes of Edwards' brain, which rendered him unable to control his impulses, a reasonable probability exists that the jury would not have convicted Edwards of first degree premeditated murder. District Judge Carney, after considering all of the evidence in support of Edwards' claim, flatly disagreed:

> [T]he shootings of Vanessa and Kelly were not crimes of impulse, but, given the surrounding circumstances and manner in which Mr. Edwards committed them, necessarily involved the premeditation and deliberation needed to establish first degree murder. Mr. Edwards' expert opinions to the contrary are not credible and likely would not sway a jury.
>
> . . .
>
> [T]he clear weight of the evidence shows that the nature of the crime itself contradicts and fatally undermines this proposed defense. The victims were two 12-year old girls walking innocently to a picnic lunch. The little girls did not know Mr. Edwards, they posed no threat to him, and they never said or did anything to him. In contrast, Mr. Edwards was a large adult man driving in a truck. He was an expert marksman who had a loaded handgun in the cab of his truck. Before shooting Vanessa between the eyes and Kelly in the head, he first drove past the two girls, looked at them, and then turned around and followed them. A few moments later, he caught up to them in a remote spot, where he could most effectively kill and escape. He drove alongside the girls, stopped, and said 'girls' to get their attention. Then, while Vanessa was looking straight at him and was thus a simple and easy target, he shot her between

the eyes, and while Kelly had a brief moment to turn her head away and was thus a moving and more difficult target, he took aim and shot her in the head. Kelly's turning of her head was what saved her life. While the girls lay on the ground, Mr. Edwards had the mental fortitude to get out of his truck, run to the back, and open its rear gate, perhaps to load their bodies in the bed of his truck. As a camper approached in another truck, Mr. Edwards was able to slam the rear gate of his truck shut, return to the cab and speed away. The camper in the truck took pursuit, but, after a high speed chase, Mr. Edwards was able to get away. He then had the presence of mind to elude an extensive manhunt by law enforcement that lasted several days. This was no crime of impulse. It was a crime of planning, premeditation and deliberation. . . .

Mr. Edwards . . . plotted and planned to execute two innocent little girls by approaching them in a remote location which would maximize his chances of completing the crime and escaping, and then by getting them into such close range and position that he would not miss when the time came to aim and pull the trigger.

. . .

Notwithstanding his mental disorders and recent divorce, and notwithstanding the opinions of Mr. Edwards' experts more than ten years after the fact, there is no substantial evidence that, at the actual time of the crimes, Mr. Edwards was acting impulsively or lacked the ability to control his actions or to premeditate.

The California Supreme Court on direct appeal had similarly found the evidence of planning "extremely strong" and

the "inference of cool, calculated premeditation . . . inescapable." *See Edwards*, 819 P.2d at 452 (Edwards carried a loaded handgun in the cab of his truck; before the shooting, he drove past the girls as they were leaving the campground, looked at them, and then turned around and followed them to a remote spot, where he could most effectively kill and escape; he drove alongside his victims, stopped, said "Girls" to get their attention, and, while Vanessa was looking straight at him and was thus an excellent target, shot and killed her; the manner of killing was exact — a single bullet between the eyes by an expert marksman — strongly implying a preconceived design to kill in precisely that fashion); *see also People v. Bloyd*, 729 P.2d 802, 810 (Cal. 1987) (premeditation and deliberation can occur in a very short period of time).

**[15]** We agree with the district court and the California Supreme Court that the circumstances of the crime negate diminished capacity. Following the girls for more than a quarter of a mile and not shooting them until they had reached "the place of maximum vulnerability," a remote spot approximately halfway between two campgrounds in an area which Edwards knew well, *see Edwards*, 819 P.2d at 447, 460, indicates that Edwards planned, deliberated, and decided where and when he would shoot his victims. Trial counsel was not ineffective for failing to present a defense that was supported neither by his experts nor by the circumstances of the crime.

### 4.   *Claim of Ineffective Assistance at Penalty Phase*

Edwards contends counsel was ineffective in failing to present Edwards' lifelong history of mental problems and disturbed behavior as mitigating evidence at penalty. This claim is similarly without support.

After thoroughly investigating Edwards' background and consulting with at least four mental health experts who found no evidence of brain damage, counsel decided not to present Edwards' troubled history to the penalty jury. Counsel chose

instead to present an aberrant act defense. Twenty-five witnesses testified they were shocked that Edwards could commit such a crime as he was a likable friend or co-worker whom they trusted with their children. A prison guard testified that Edwards caused no trouble as a prisoner. Despite the heinousness of the crime, counsel's aberrant act defense was persuasive enough to hang the first penalty jury and require three days of deliberations before the third penalty jury returned a verdict of death. Although the second penalty jury returned a death verdict, Edwards represented himself at that trial.

**[16]** As we have seen in relation to Edwards' *Brady* claim, Edwards' history of mental problems and disturbed behavior is, on the whole, highly aggravating in its own right and would open the door to even more damaging evidence. Counsel's decision not to present evidence of Edwards' troubled background to the penalty jury was a reasonable strategic decision. *See Wiggins,* 539 U.S. at 525, 535 (counsel may reasonably decide to forego presentation of mitigating history that is double-edged).

Comparison of counsel's informed and reasonable strategic decision in this case with the conduct of counsel in two of our recent decisions illustrates the point. In *Correll v. Ryan*, ___ F.3d at ___, 2008 WL at 2039074 (9th Cir. May 14, 2008), unless there was mitigation, the death penalty was required by Arizona law so long as the trial judge found at least one aggravator. There was an aggravator. Thus, if no mitigation case was presented the death penalty was inevitable. Correll's counsel, however, believed the trial judge would react unfavorably to double-edged evidence offered in mitigation, and so he presented no mitigation case, even though by its absence death was almost certain, and even though Arizona law required the appellate court to conduct an independent review. In short, Correll's counsel had everything to gain and nothing to lose by putting on a mitigation case, yet he did nothing.

**[17]** In *Belmontes v. Ayers*, ___ F.3d ___, 2008 WL 2390140 (9th Cir. June 13, 2008), we granted relief where trial counsel failed to consult with mental health experts at all regarding the possibility of a mental defect defense for the penalty phase. In that case, the record contained information about the defendant's background that might well have persuaded the jury against imposing the death penalty, yet counsel made no investigation and hence no informed decision on the issue. In contrast, Edwards' counsel did all the investigation he could reasonably do and made the reasonable strategic decision that the evidence of Edwards' troubled history would give rise to prejudicial rebuttal evidence of fetishes, violent fantasies, sexual hangups and other behavior his counsel accurately described as "bizarre."

Two prior mistrials at the penalty phase demonstrate that this was a close death penalty case. There was a judgment to be made; Edwards' counsel made an informed one, and the trial judge made the same assessment at the penalty modification hearing. Recent scholarship tends to support the judgment. *See* John M. Fabian, *Death Penalty Mitigation and the Role of the Forensic Psychologist*, 27 Law & Psychol. Rev. 73, 90 (2003) (evidence of mental illness may backfire because jurors may view it as aggravating; "in some cases, presenting evidence of . . . mental disorders to create empathy in the jury might actually cause them worry and concern that the defendant is an 'irreparable monster' "); Ronald J. Tabak, *Executing People With Mental Disabilities: How We Can Mitigate An Aggravating Situation*, 25 St. Louis U. Pub. L. Rev. 283, 288-89 (2006) (juries often view severe mental illness as more aggravating than mitigating; "because of fear that juries will act in this manner, many defense attorneys decide not to present evidence of severe mental illness" at sentencing and counsel "who act in this manner are frequently held not to have been ineffective").

**[18]** In sum, Edwards' counsel was not ineffective when after a thorough investigation he decided not to present to the

jury evidence of Edwards' troubled background, evidence which in "its best possible light" was a "basket of cobras." *See Gerlaugh*, 129 F.3d at 1035.

## Conclusion

Edwards had the assistance of competent counsel in both the state and federal courts, and the thoughtful attention of two able federal district court judges who, after extensive evidentiary hearings, rejected his claims. Edwards has acknowledged his commission of a terrible crime, and he has not established that he received anything other than a fair trial. The lying in wait special circumstance that the jury found as supporting imposition of the death penalty is in accord with the law of this Circuit. There is no reasonable probability of a different result at the guilt phase or at the penalty phase had the prosecution disclosed Edwards' complete Patuxent file to the defense. Trial counsel reasonably decided not to present Edwards' lifelong history of mental problems and disturbed behavior at guilt or at penalty. The judgment of the district court denying the petition is AFFIRMED.